UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| DARWIN QUINONES-PIMENTEL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-01443-JAW |
| | ) | |
| NICHOLAS W. CANNON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING MOTIONS TO DISMISS**

Two sets of defendants file motions to dismiss plaintiffs' *Bivens* action lawsuit, which alleged violations of their Fourth Amendment rights. In keeping with the United States Supreme Court's directive that courts should be reticent to expand *Bivens* actions, the Court concludes that the present case should be dismissed because it presents a new *Bivens* context, and there are special factors counseling against expanding *Bivens* in this case, namely separation of powers concerns and alternative remedies available to the plaintiffs. The Court grants both sets of Defendants' motions to dismiss.

## I.    PROCEDURAL HISTORY

On August 25, 2020, Darwin Quinones-Pimentel, Victor Vega- Encarnacion,[1] Naicom Corporation, Naicom Data Center, Artist Designs and Management Corporation, and Kiaras, LLC, filed a fifty-five-page so-called *Bivens*[2] action

---

[1]    The Complaint refers to Darwin Quinones-Pimentel as "Darwin Quinones" and Victor Vega-Encarnacion as "Victor Vega." The Court refers to Plaintiffs in the same manner in this Order.

[2]    *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

lawsuit against Nicholas W. Cannon, Assistant United States Attorney (AUSA), several unknown AUSA supervisors, Federal Bureau of Investigation (FBI) agents Douglas A. Leff, Brad Rex, Lance Lange, Kevin Reaves, Andrew Baker, Chris Kuhn, Celia Mahler, Clay Rehrig, Noah Eames, Justin Turner, Mark Etheridge, and Clint Nafay, FBI computer scientist, Juan Galarza, FBI evidence technician, Jason Lopez, several unknown named FBI agents, NagraStar investigators Bert Eichhorn, Jordan Smith, and Emily Rinkel, and DISH Network investigator Kevin Gedeon.[3]  *Compl.* (ECF No. 1).

On January 6, 2021, the DISH/NagraStar Defendants filed a motion to dismiss the Complaint.  *Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(5) & 12(b)(6)* (ECF No. 69).  On January 11, 2021, the Government Defendants, including AUSA Nicholas Cannon and the named FBI agents and employees, filed a joint motion to dismiss all counts of the Plaintiffs' Complaint.  *Mot. to Dismiss* (ECF No. 82); *Mem. of Law in Supp. of Defs.' Mot. to Dismiss* (ECF No. 83).  On February 12, 2021, the Plaintiffs filed their response, with supporting evidence, in opposition to the DISH/NagraStar Defendants' motion to dismiss.  *Pls.' Opp'n to Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(5) & 12(b)(6)* (ECF No. 113).  On March 3, 2021, the Plaintiffs filed their response, with supporting evidence, in opposition to the Government Defendants' motion to dismiss.  *Pls.' Opp'n to Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* (ECF No. 119).

---

[3]      The Court collectively refers to the AUSA and FBI defendants as the "Government Defendants" and Bert Eichhorn, Jordan Smith, Emily Rinkel, and Kevin Gedeon as the "DISH/NagraStar Defendants."

On March 4, 2021, the Plaintiffs filed an Amended Complaint.[4]  *Am. Compl.* (ECF No. 122); *Second Am. Compl.* (ECF No. 202) (*Suppl. Am. Compl.*).[5]  On March 8, 2021, at their request, the Court dismissed without prejudice the DISH/NagraStar Defendants' motion to dismiss as moot in light of Plaintiffs' Amended Complaint. *Orders* (ECF Nos. 126 & 127).  On March 11, 2021, the Court similarly dismissed without prejudice the Government Defendants' pending motion to dismiss.  *Order* (ECF No. 132).

On June 22, 2021, the DISH/NagraStar Defendants filed a renewed motion to dismiss in response to the Plaintiffs' Amended Complaint.  *Defs. Bert Eichhorn, Kevin Gedeon, Emily Wrinkle, and Jordan Smith's Rule 12(b)(6) Mot. to Dismiss* (ECF No. 176) (*DISH/NagraStar Defs.' Mot.*).  On July 23, 2021, the Government Defendants filed a motion to dismiss Plaintiffs' Amended Complaint.  *Mot. to Dismiss* (ECF No. 183); *Mem. of Law in Supp. of Defs.' Mot. to Dismiss* (ECF No. 184) (*Gov't Defs.' Mot.*).

On July 30, 2021, the Plaintiffs filed their opposition to the DISH/NagraStar Defendants' motion to dismiss.  *Pls.' Opp'n to Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* (ECF No. 190) (*Pls.' Opp'n to DISH/NagraStar Defs.' Mot.*).  On August 5, 2021, the Plaintiffs filed an opposition in response to the Government Defendants' motion to dismiss.  *Pls.' Opp'n to Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* (ECF No. 196) (*Pls.' Opp'n to Gov't Defs.' Mot.*).  On September 7,

---

[4]     The named Defendants remained the same except for Kevin Reaves, whose name was corrected to Kevin Pearson in the First Amended Complaint.

[5]     The Plaintiffs later filed a Supplemental First Amended Complaint to correct DISH/NagraStar Defendant Emily Rinkel's name, which was incorrectly spelled "Emily Wrinkle."  *See Order on Defs.' Mot. for Reconsideration and Pls.' Mot. to Declare Reconsideration Moot* (ECF No. 209).  The Supplemental First Amended Complaint is the operative document but is substantively the same as the Amended Complaint filed March 4, 2021, with the exception of the name correction.  *See id.*

2021, the DISH/NagraStar Defendants filed a reply to the Plaintiffs' opposition. *Defs. Eichhorn, Gedeon, Rinkle and Smith's Reply in Supp. of Fed. R. Civ. P. 12(b)(6) Mot. to Dismiss* (ECF No. 212) (*DISH/NagraStar Defs.' Reply*). On September 13, 2021, the Government Defendants filed their reply to the Plaintiffs' opposition. *Reply to Pls.' Opp'n to the Federal Defs.' Mot. to Dismiss* (ECF No. 213) (*Gov't Defs.' Reply*). Finally, on September 30, 2021, the Plaintiffs filed a sur-reply to the Government Defendants' reply to the Plaintiffs' opposition to the Government Defendants' motion to dismiss. *Pls.' Sur-Reply to the Defs.' Reply to Pls.' Opp'n to the Federal Defs.' Mot. to Dismiss* (ECF No. 218) (*Pls.' Sur-Reply*).

## II.   FACTS[6]

### A.   Naicom's Origins

Between 2002 and 2012, Naicom's President and Chief Executive Officer, Darwin Quinones developed an Internet Multicast Distribution System. *Suppl. Am. Compl.* ¶ 38. The system was identified as a Dynamic Internet Semantic Multicast Environment (DISME), and its code sources have been kept confidential under the Federal Defendant Trade Secrets Act. *Id.* ¶¶ 39-40. DISME proprietary solutions enable broadcast media via the internet by creating Internet Protocol Television (IPTV) services which distribute live-video television content via the internet and private networks. *Id.* ¶ 39. In April 2012, the Federal Communications Commission

---

[6]    Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Plaintiffs' Supplemental Amended Complaint. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in the plaintiffs' favor") (internal citation omitted).

(FCC) recognized and encouraged the implementation of Digital Broadcast Television using IPTV for customers in the United States.  *Id.* ¶ 40.

By 2016 Mr. Quinones had completed all DISME technology alpha and beta tests and, alongside Victor Vega, founded Naicom Corporation.  *Id.* ¶ 41.  Naicom Corporation is a network and internet communication platform that delivers live television, video on-demand content, internet, and wireless network services to subscribers worldwide.  *Id.* ¶ 41.  Naicom also provides instant access to television shows, movies, and music/videos on-demand, and live sports and music events through Naicom's set-top box using IPTV and TV Everywhere (TVE) on any mobile device.  *Id.*  Mr. Quinones and Mr. Vega registered Naicom Corporation as a closed corporation with the State Department of Puerto Rico and complied with all requirements as a legitimate IPTV business.  *Id.* ¶ 42.  Naicom also began manufacturing its own brand of set-top boxes for end users through Informir LLC and acquired the programing licenses to distribute on-demand content in the United States, Puerto Rico, and the Virgin Islands through worldwide television network companies.  *Id.* ¶¶ 43-44.  In 2017, Naicom became a member of the National Rural Telecommunications Cooperative (NRTC).  *Id.* ¶ 44.  The Plaintiffs allege that the Defendants were aware that Naicom duly registered and complied with IPTV business requirements, acquired these licenses, and was a member of the NRTC.  *Id.* ¶¶ 42, 44.

In 2016, Naicom executed a Business Executive Summary and Valuation for potential investors and began exploring business opportunities with other cable tv

companies. *Id.* ¶ 45. On January 6, 2017, Naicom submitted a request to the Apple Corporation to have its TV App added to Apple's AppStore. *Id.* ¶ 46. Apple's legal department requested that Naicom produce all licenses authorizing the distribution of programming to Naicom's subscribers via Naicom's TV App. *Id.* ¶ 46. On February 16, 2017, Apple approved Naicom's App for inclusion in the Apple AppStore. *Id.* ¶ 47. In December 2017, Sams Club approved Naicom to launch and distribute Naicom's IPTV set-top box in their retail stores, which Plaintiffs allege Defendants were aware of. *Id.* ¶ 48.

### B. Negotiations with Claro Puerto Rico

In 2017, Naicom entered into negotiations with Claro Puerto Rico to distribute Naicom set-top boxes to Claro residential and business internet customers. *Id.* ¶ 49. Claro represented to Naicom that it had approximately 320,000 internet subscribers who received only eight Megabytes and thus could not subscribe to Claro's IPTV services, which required sixty Megabytes to upload programming. *Id.* ¶ 50. During negotiations, Naicom and Claro entered into a mutual non-disclosure agreement (NDA) prior to discussing and analyzing business information and the contents of the resellers' agreement. *Id.* ¶ 51. Claro's Product Development Officer Anibal Rios projected that the Claro-Naicom business alliance would bring in over $10,000,000 in monthly gross revenue for the first year and over $13,000,000 for the second year just by penetrating Claro's corporate and residential subscribers in Puerto Rico. *Id.* ¶ 52. Naicom projected that the Claro-Naicom alliance would add 100,000 new corporate subscribers, plus another 150,000 residential subscribers, bringing in a projected

monthly income revenue of $9,000,000 in the first year, and $12,000,000 in the second in gross sales.  *Id.* ¶ 53.

Claro had an existing contract with DISH Network Satellite TV, whereby DISH Network provided TV programming to Claro's internet subscribers who could not subscribe to Claro's IPTV services.  *Id.* ¶ 54.  The Naicom deal represented a cancellation threat to DISH Network's contract with Claro.  *Id.*  Claro was also considering shutting down its IPTV business division due to loss of revenue.  *Id.*  During the negotiations for the Claro-Naicom deal, Carlos Garcia, Claro's IPTV business manager, became privy to information that the Claro-Naicom deal would leave him jobless if Claro opted to shut down its IPTV division, which he managed.  *Id.* ¶ 55.  Mr. Garcia alerted DISH Network that the Claro-Naicom IPTV deal would lead to cancellation of the DISH contract with Claro, which the Plaintiffs allege lead to "great animosity" between DISH Network and Naicom.  *Id.* ¶ 56.  The Plaintiffs allege that Mr. Garcia convened a meeting of DISH Network executives and convinced them that Naicom was an IPTV pirate company because he had Claro employees photograph Naicom's Data Center and the way Naicom established its satellite dishes lock angle indicated that Naicom dishes were being used for TV piracy.  *Id.* ¶ 57.  Naicom Data Center employees caught Claro employees photographing Naicom's Data Center.  *Id.* ¶ 58.  On August 14, 2018, after a year of meetings between Naicom and Claro, Claro pulled out of negotiations without notice.  *Id.* ¶ 59.

### C.     The DISH Network Investigation

On August 7, 2017, NagraStar instructed Brian Parson to purchase a Naicom TV set-top box receiver to conduct tests and monitor Naicom's programming. *Id.* ¶ 61. According to the DISH/NagraStar Defendants, their investigation revealed that the receiver provided access to approximately forty-three channels, including Disney, TBS, ESPN, CNN, HBO, Showtime, and Cinemax. *Id.* ¶ 62. The investigating DISH/NagraStar Defendants downloaded the Naicom TV App through the Apple AppStore, which provided access to approximately forty-two channels, and tested Naicom TV several times to identify if it was providing DISH programming. *Id.* ¶¶ 63-64. In each case, the tests revealed no DISH content. *Id.* ¶ 65.

NagraStar and DISH Network investigators also contacted several media companies to inquire into whether Naicom had the appropriate licensing contracts to distribute its programming. *Id.* ¶ 65. On each occasion, the investigators were informed that Naicom was authorized to distribute its content. *Id.* The investigators also discovered that Naicom's TV distribution technology was a threat to DISH Network and Sling for subscribers in Puerto Rico and the United States. *Id.* ¶ 66.

NagraStar and DISH Network investigators thereafter filed a complaint with the FBI alleging that Naicom Corporation was running an IPTV pirate operation. *Id.* ¶ 67. Plaintiffs allege that the motive behind the complaint against Naicom was to secure NagraStar and DISH Network's participation in the execution of a search warrant for Naicom's Data Center and the seizure of Naicom's computers, servers, and other hardware containing Naicom's intellectual property and trade secrets, under the ruse of assisting the FBI in discovering incriminating evidence. *Id.* ¶ 68.

8

**D.    The FBI and United States Attorney's Office Investigation**

Beginning in September 2017 and throughout 2018, DISH Network Investigator, Kevin Gedeon, and NagraStar investigators, Jordan Smith, Bert Eichhorn and Emily Rinkel, met with Douglas A. Leff, the FBI Special Agent in charge of the San Juan Division to discuss Naicom's alleged IPTV pirate operation. *Id.* ¶ 69.  Agent Leff thereafter opened a criminal investigation. *Id.*

Agent Leff arranged a meeting among Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and Ms. Rinkel, and FBI Cyber Task Force Supervisor, Special Agent Brad Rex, to discuss details of the criminal investigation.  *Id.* ¶ 70.  Agent Leff requested that Agent Rex keep him informed of developments in the investigation so that he could discuss potential criminal prosecution with AUSA Nicholas Cannon.  *Id.* ¶ 71.  Agent Rex thereafter launched an investigation and instructed FBI Cyber Task Force Special Agents Kevin Pearson, Andrew Baker, Chris Kuhn, Celia Mahler, Clay Rehrig, Noah Eames, Justin Turner, Mark Ethridge, Clint Nafay, Juan Galarza, Jason Lopez, and several other FBI agents to work with the DISH/NagraStar investigators and Lance Lange, the FBI agent assigned to the case.  *Id.* ¶ 72.

Plaintiffs allege that AUSA Cannon and several other AUSA supervisors participated, supervised, led, coached, and instructed the FBI agents and DISH/NagraStar investigators throughout the criminal investigation beginning in 2017 up until the preparation of the affidavit for a warrant in 2019.  *Id.* ¶ 73. Plaintiffs also submit that neither AUSA Cannon nor any of the FBI agents contacted Wapa TV, Disney, HBO, Turner, NBC, Condista, CBS, Telecinco, ABC, the National Rural Telecommunications Cooperative, Apple Corporation, or Sams Club to

9

investigate and corroborate whether Naicom lacked the contract licenses to distribute the programming content through Naicom's TV set-top boxes, Apple iPhone App, or its contract to distribute TV set-top boxes at Sams Club retail stores. *Id.* ¶ 74. Most of the evidence furnished to the FBI, Plaintiffs allege, was collected by the DISH/NagraStar investigators in violation of United States copyright laws. *Id.*

At the final stage of the investigation, AUSA Cannon, the FBI agent defendants and the DISH/NagraStar investigators met to discuss the investigatory files, notes, memoranda, reports, photographs, videos, and other collected evidence to prepare a warrant application. *Id.* ¶ 75. The Plaintiffs allege that at this meeting, the Defendants collectively noted that the evidence did not support probable cause to procure a search and seizure warrant and that it was at this meeting that the Government and DISH /NagraStar Defendants decided to conspire with each other to figure out a way to alter the evidence in order to satisfy probable cause. *Id.* ¶¶ 76-77.

On August 27, 2019, AUSA Cannon met with Agent Lange to review, approve, and sign the final draft of the affidavit and application in support of the search warrant. *Id.* ¶ 79. The Plaintiffs allege AUSA Cannon and Agent Lange knew the affidavit and warrant application, which they filed under oath, contained false and perjured testimony. *Id.* That same day, AUSA Cannon and Agent Lange met with United States Magistrate Judge Silvia Carreño-Coll to discuss their warrant application to search Naicom Corporation, located at Building Centro de Seguros, 701 Ponce de Leon, Suite 208, San Juan, Puerto Rico 00907, and Naicom's Data Center

located at Villa Fontana, 4SS N2 Via Josefina, Carolina, Puerto Rico 00983. *Id.* ¶ 80. There was no discussion of authorizing a search of Artist Designs & Management Corporation (ADM), located at Building Centro de Seguros, 701 Ponce de Leon, Suite 207, San Juan, Puerto Rico 00907. *Id.* At the meeting, AUSA Cannon and Agent Lange assured the Magistrate Judge under oath that the contents of the affidavit filed in support of the search warrant were truthful and supported by probable cause. *Id.* ¶ 81. They also assured the Magistrate Judge that the warrant was being used to gather evidence of criminal conduct, including a criminal copyright property offense, criminal infringement of a copyright, money laundering, wire fraud, and unlawful access to computer systems. *Id.* ¶ 81. Magistrate Judge Carreño-Coll approved the affidavit in support of the warrant and directed the FBI to execute the search warrant on or before September 4, 2019.

### E.   Execution of the Search Warrant

#### 1.   The Search of Naicom's Offices

On August 27, 2019, the FBI agent Defendants and DISH/NagraStar investigators entered Naicom's offices, located at Building Centro de Seguros, 701 Ponce de Leon, Suite 208,[7] San Juan, Puerto Rico 00907 to execute the warrant. *Id.* ¶ 83. During the execution of the warrant Agent Lange ordered Naicom staff member Yamila Garcia to unlock ADM located at Suite 207, which was not included in the search warrant. *Id.* ¶ 84. Ms. Garcia informed Agent Lange that ADM was an

---

[7]      The Supplemental Amended Complaint states that they entered Suite 207, not 208; however, based on facts alleged earlier in the Complaint, the Court believes that the Plaintiffs must mean Suite 208. The correct suite number does not affect the merits of this decision.

independent business and that the search was directed at Naicom, but Agent Lange ordered her to open the doors. *Id.* Agent Lange and the DISH/NagraStar investigators entered and seized private and confidential ADM documents. *Id.*

During the execution of the warrant, Mr. Eichhorn, in the presence of Agent Lange, took keys belonging to Mr. Vega and Mr. Quinones from the Naicom, ADM and Naicom Data Center offices; Mr. Eichhorn and Ms. Rinkel entered Naicom's business office without FBI agent supervision and searched, inspected, and photographed private documents containing business trade secrets and intellectual property information belonging to Naicom; Mr. Eichhorn and Ms. Rinkel entered Mr. Vega's office without FBI agent supervision and photographed private documents containing business trade secrets and intellectual information belonging to Naicom; Mr. Eichhorn accessed Naicom's computers and searched, read, and photographed their contents, which contained trade secrets and intellectual property belonging to Naicom; workers from the other offices in the building witnessed the embarrassment of Naicom employees. *Id.* ¶¶ 85-89. During the search, Agent Lange, the other FBI agents and DISH/NagraStar investigators seized Plaintiffs' documents, two hard drives, two USB thumb drives, a cell phone, and one tablet containing business trade secrets and intellectual property. *Id.* ¶ 90. The Defendants left a copy of the warrant and a receipt of the property seized during the search. *Id.*

### 2.    The First Search of Naicom's Data Center

On August 27, 2019, Agent Pearson, other unknown FBI agents, Mr. Smith, and Mr. Gedeon entered Naicom's Data Center to execute the search warrant. *Id.* ¶ 91. During the search, Mr. Quinones observed Agent Pearson allow Mr. Smith and

Mr. Gedeon to access and personally search Naicom's Data Center computers, servers and other electronic hardware containing business trade secrets and intellectual property and to take pictures of Naicom's Data Center structural and network connection platform. *Id.* ¶ 92. Agent Pearson, Mr. Smith, and Mr. Gedeon questioned Mr. Quinones and Naicom employee Jaime Echevarria about Naicom's technology, functions, and protocols. *Id.* ¶ 93. During the search, Mr. Quinones requested that Agent Pearson give him an opportunity to demonstrate that he was running a legitimate IPTV operation. *Id.* ¶ 94. Mr. Quinones thereafter called Linda Kosher from the National Rural Telecommunications Cooperative who assured Agent Pearson that Naicom was authorized to distribute the programming content via the Naicom TV Home set-top box to its registered subscribers. *Id.*

Agent Pearson called AUSA Cannon and informed him that they did not find any evidence indicating that Mr. Quinones was running an IPTV pirate distribution business and assured him that it appeared Naicom was a legitimate company. *Id.* ¶ 95. AUSA Cannon instructed Agent Pearson to instruct Mr. Quinones and Mr. Vega to report to the FBI offices in San Juan with their licensing contracts for an interview. *Id.* ¶ 96.

Back at the FBI offices, Agent Pearson, Mr. Smith, and Mr. Gedeon questioned Mr. Quinones, in the presence of Naicom's attorney, about how Naicom acquired the IPTV distribution contracts and technology used to distribute its programming. *Id.* ¶ 97. Mr. Quinones and Mr. Vega clarified and established through Naicom's licenses and contracts with television networks that Naicom was running a legitimate IPTV

business operation. *Id.* ¶ 99. During the interview, Mr. Quinones asked Agent Pearson whether Mr. Smith and Mr. Gedeon were employees from his competition, based on their line of questioning. *Id.* ¶ 98. Agent Pearson assured Mr. Quinones that Mr. Smith and Mr. Gedeon were expert workers of the FBI and provided Mr. Quinones with their identities. *Id.* Mr. Eichhorn and Ms. Rinkel refused to identify themselves. *Id.* At this time, Mr. Vega asked to terminate the interview due to Mr. Smith's and Mr. Gedeon's intensive interrogation regarding Naicom's distribution technology. *Id.* ¶ 100.

### 3.   The Second Search of Naicom's Data Center

On August 29, 2019, AUSA Cannon ordered Agents Lange and Pearson to return to Naicom's Data Center to perform another search and have the Plaintiffs sign a hold harmless document. *Id.* ¶ 101. Agent Lange, Agent Pearson, Mr. Eichhorn, Mr. Smith, and Mr. Gedeon entered the Data Center and performed a second search. *Id.* Agent Pearson contacted Naicom employee Jaime Echevarria and ordered him to come to the Data Center, as Agent Pearson wanted to speak with him, Mr. Quinones, and Mr. Vega. *Id.* ¶ 102. Upon arriving at the Data Center, Mr. Quinones observed Mr. Smith, Mr. Gedeon, and Mr. Eichhorn accessing Naicom's Data Center computers, servers, and other hardware equipment without authorization. *Id.* ¶ 103.

During the search, Agents Pearson and Lange pressured Mr. Quinones to sign a hold harmless document accepting that he was running a pirate operation in the past so that they could close the case or else they would shut down the Data Center operation. *Id.* ¶ 104. Mr. Quinones refused. *Id.* ¶ 105. Sometime thereafter, Mr.

Vega arrived and upon entering the Data Center asked Agents Pearson and Lange if they had another search warrant to enter and search the Data Center. *Id.* ¶ 106. Agent Lange represented to Mr. Vega that the search warrant gave him ten days to come in and out and search the Data Center. *Id.* Mr. Vega warned Agent Lange that Agent Lange was violating the United States Constitution and Federal law. *Id.*

Mr. Vega thereafter informed Agents Pearson and Lange that he had discovered via LinkedIn that the alleged FBI experts who executed the search and interrogated Mr. Quinones and him at the FBI offices were Kevin Gedeon, investigator for DISH Network, and Jordan Smith, Bert Eichhorn, and Emily Rinkel, investigators for NagraStar. *Id.* ¶ 107. Mr. Vega questioned Agents Lange and Pearson as to why the FBI brought in his competition to search, inspect, and photograph private documents and allowed them access to computers and servers containing trade secrets, code sources, and business and intellectual property belonging to Naicom. *Id.* ¶ 108. Mr. Vega called his attorney and told him about the second search. *Id.* ¶ 109. After speaking with Agent Lange, the FBI agents and DISH/NagraStar investigators left the premises. *Id.*

On August 30, 2019, Mr. Vega texted Agent Pearson seeking authorization to enter Naicom's Data Center and start up Naicom's distribution system to restore customer service. *Id.* ¶ 110. After instructing Mr. Vega to have his attorney contact the FBI, Agent Lange authorized Mr. Vega to enter Naicom's Data Center and restore the program. *Id.*

**F.     The Demand for the Return of Property Under Rule 41(g)**

On September 6, 2019, the Plaintiffs filed a motion to demand the return of seized property under Rule 41(g) of the Federal Rules of Criminal Procedure.  *Id.* ¶ 111.  In their motion, the Plaintiffs argued that the search and seizure was unlawful because (1) it contained deliberately and recklessly false statements made under oath so the Magistrate Judge would issue the warrant and (2) the warrant was issued in violation of the Fourth Amendment, and they demanded the immediate return of all unlawfully seized property.  *Id.* ¶ 112.  To their motion, the Plaintiffs attached Naicom's contracts authorizing distribution of content programming in Puerto Rico, the United States, and the Virgin Islands, evidence that the Defendants never called HBO or NRTC to ask about Naicom, and evidence that the investigation was a ruse orchestrated by NagraStar and DISH Network to access Naicom's trade secrets and intellectual property.  *Id.* ¶ 113.

On October 15, 2019, the United States filed an unopposed response to the Plaintiffs' Rule 41(g) motion stating that, without conceding any arguments raised, the property items listed in the request would be returned.  *Id.* ¶ 114.  The District Court granted the Plaintiffs' Rule 41(g) motion on November 5, 2019.  *Id.* ¶ 115.  On February 19, 2020, Agent Lange met with Mr. Quinones, Mr. Vega, and Attorney Rafael Castro Lang to return the seized items to the Plaintiffs.  *Id.* ¶ 117.  At the meeting, Agent Lange returned the seized items and gave the Plaintiffs an FBI document titled Document Search Warrant Execution at Naicom Corporation Headquarters, which disclosed details of the search and the identities of the FBI agents involved.  *Id.*

### G.    The Plaintiffs' Alleged Harm

The Plaintiffs allege that the criminal investigation caused significant damage to their business reputation. *Id.* ¶ 118.  They allege that prior to the execution of the search warrants, the Plaintiffs had a great reputation and were about to close on a $15,000,000 investment deal, but that investors pulled out upon learning Naicom was under criminal investigation. *Id.* ¶¶ 119-120.  The Plaintiffs also allege that Naicom was about to close a multimillion-dollar deal with Claro when Claro learned of the FBI's investigation and pulled out of negotiations. *Id.* ¶ 121.  The Plaintiffs say they have lost subscribers because of a negative reputation resulting from the investigation and that the Defendants' intrusion into Naicom's Data Center computers, servers, and equipment caused damage leaving subscribers without tv programming services for several weeks. *Id.* ¶ 122.

### H.    The Plaintiffs' Cause of Action

The Plaintiffs bring three counts.  Count One alleges that Nicholas W. Cannon, several unknown AUSA Supervisors, Douglas A. Leff, Brad Rex, Lance Lange, Kevin Pearson, Andrew Baker, Chris Kuhn, Celia Mahler, Clay Rehrig, Noah Eames, Justin Turner, Mark Etheridge, Clint Nafay, Juan Galarza, Jason Lopez, several unknown named FBI Agents, Jordan Smith, Kevin Gedeon, Bert Eichhorn, and Emily Rinkel violated Plaintiffs' Fourth Amendment rights by "formulating false and perjured evidence and statements to be used in support of the affidavit" for a search warrant, conspiring to file an affidavit under oath containing false information, and intentionally deceiving the Magistrate Judge to get her to issue the search warrant. *Id.* at 48-50.

Count Two alleges that Brad Rex, Lance Lange, Kevin Pearson, Andrew Baker, Chris Kuhn, Celia Mahler, Clay Rehrig, Noah Eames, Justin Turner, Mark Etheridge, Clint Nafay, Juan Galarza, Jason Lopez, several unknown named FBI agents, Kevin Gedeon, Jordan Smith, Bert Eichhorn, and Emily Rinkel violated the Plaintiffs' Fourth Amendment rights by searching and seizing information from the Artist Designs and Management Corporation office, which was not included in the search warrant. *Id.* at 53.

Finally, Count Three alleges that AUSA Nicholas Cannon, Agents Lance Lange and Kevin Pearson, Jordan Smith, Kevin Gedeon, and Bert Eichhorn violated the Plaintiffs' Fourth Amendment rights by entering Naicom's Data Center on August 29, 2019, without a new warrant. *Id.* at 56-57.

All three counts are brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics.*

## III.   THE PARTIES' POSITIONS

### A.   The DISH/NagraStar Defendants' Motion to Dismiss

The DISH/NagraStar Defendants first argue that the Plaintiffs' claim should be dismissed because allowing their claims to proceed would require the Court to expand *Bivens*, which is a "disfavored judicial activity." *DISH/NagraStar Defs.' Mot.* at 2, 8. The DISH/NagraStar Defendants contend that the Plaintiffs' claims "undeniably arise in a new context, [and] bear little resemblance to *Bivens* and its progeny" because they "consist of different conduct by different officers operating under different mandates from different agencies and involve private individuals." *Id.* at 9-10. The Defendants explain that unlike the individual whose home was

18

searched by the FBI without a warrant in *Bivens*, the "Plaintiffs complain of a search, pursuant to a warrant, of their business offices in Puerto Rico, by FBI agents, and private citizens, which resulted in no booking, strip search or arrest but rather the seizure of certain business records and other property, which was eventually returned." *Id.* at 10-11.

Second, the DISH/NagraStar Defendants submit that "[t]he mechanism of injury in this case also varies significantly from that in *Bivens*," which involved "a direct causal connection . . . between the plaintiff's injuries and the federal agents' conduct." *Id.* at 11. Here, the Defendants say that the "Plaintiffs' injury occurred through a series of intervening steps which involved independent legal decisions, made at various stages, by separate and distinct legal officers." *Id.* at 12 (internal quotation marks omitted).

Third, the DISH/NagraStar Defendants say that the Plaintiffs' Fourth Amendment Claims require significantly different proof than those in *Bivens*. *Id.* The Defendants argue that this case "would require discovery or an investigation into the evidence before numerous decision-makers, running the risk of disruptively intruding into the functioning of other branches and would require fact-checking and other probing into executive agency decisions." *Id.* (citing *Clinton v. Jones*, 520 U.S. 681, 701 (1997)).

Additionally, the DISH/NagraStar Defendants claim that the Plaintiffs' *Bivens* action involves a new category of defendants because they are "private individuals." *Id.* at 13. Relying on *Correctional Services Corporation v. Malesko*, 534 U.S. 61

(2001), and *Minneci v. Pollard*, 132 S. Ct. 617 (2012), the Defendants contend that the Supreme Court "rejected expanding *Bivens* liability to 'private entities acting under color of law.'" *Id.* at 13 (quoting *Malesko*, 534 U.S. at 63).

Applying the various Supreme Court tests for determining whether a private party acted under the color of law, the DISH/NagraStar Defendants say they "have no direct links to the government, as they do not carry out any traditional or exclusive public function, are not in any symbiotic relationship with the government and are not federal officials, federal employees, individuals who have received any delegation of federal authority or contractors employed or under contract with the federal government." *Id.* at 17. They argue that their "connection with the searches and seizures . . . [is] too attenuated to constitute 'federal or state action' for [Fourth] Amendment purposes" and that "at best" they were "'in the company of' or accompanied the FBI defendants during their warrant execution in this case." *Id.* at 18.

Turning to prong two of the *Bivens* extension test, the DISH/NagraStar Defendants argue that multiple special factors counsel against expanding *Bivens* to this case. *Id.* at 20. First, they submit that the "Plaintiffs had three alternative remedies available: the Federal Tort Claims Act, Puerto Rico Law and Fed. R. Crim. P. 41(g)." *Id.* at 21. Second, the Defendants contend that expanding *Bivens* would "pos[e] the risk of burdening and encroaching on the . . . executive branch's investigative and prosecutorial functions" and may "chill federal executive employees in the execution of their duties, thus undermining the separation of powers between

20

the governmental branches." *Id.* at 23 (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017)).

The DISH/NagraStar Defendants further argue that the Plaintiffs' *Bivens* conspiracy claim is inadequate because it "allege[s] no more than a dissatisfaction with how law enforcement officers discharged their duties—not facts demonstrating a colorable claim that an actual agreement existed amongst the defendants to deprive Plaintiffs of their constitutional rights." *Id.* at 24. They submit that the "Plaintiffs' mere assertions that 'upon information and belief' the defendants conspired, colluded or acted in concert with one another to commit tortious acts against them, without more, will not suffice to state a *Bivens* conspiracy claim." *Id.* at 25.

In the final section of their brief, the DISH/NagraStar Defendants contend that even assuming *Bivens* can be expanded, the Plaintiffs' allegations under each Count fail to state a claim on which relief can be granted. *Id.* at 25-31.

As to Count One, the Defendants argue that there was no violation of a valid warrant or illegal search in violation of the Fourth Amendment because the FBI Defendants secured a warrant, a neutral magistrate judge "made an independent determination that sufficient probable cause existed" and that any doubt should be "resolve[d] . . . in favor of a magistrate judge's probable cause finding." *Id.* at 26. The Defendants further say that the "Plaintiffs have not only failed to attribute any purported falsehoods to the[m] . . . but have also failed to assert [] the omission of any such falsehoods . . . [that] would otherwise vitiate the probable cause finding in this case." *Id.* at 27. The DISH/NagraStar Defendants contend that their accompaniment

of "the FBI defendants during the course of the search and seizure does not render the search invalid and/or unreasonable, as the FBI defendants are given latitude in conducting computer searches and no particularized search protocol or strategy is required." *Id.* at 27 (citing 18 U.S.C. § 3105).

As to Count Two, the DISH/NagraStar Defendants argue that they did not conduct a warrantless search of the ADM office because photographs of the space "denote that Artist Designs' office space is located within and/or adjoining to Naicom's space, displays a 'Naicom HQ' stamp, and does not reflect that of a distinct office or business space." *Id.* at 28.  Citing *United States v. Ferreras*, 192 F.3d 5, 10-11 (1st Cir. 1999), the Defendants say that "a search warrant will not be deemed invalid, or . . . unreasonable, due to the failure to specify a subunit or numerical address to be searched, where, as in this case, the multi-unit character of the premises was not externally apparent." *Id.* at 29.  They emphasize that here, "searching agents or individuals reasonably could conclude that Artist Designs' office, was appurtenant to Suite 208, and as such, a search of the area fell within the purview of the warrant." *Id.*

Finally, as to Count Three, the DISH/NagraStar Defendants argue that, even assuming that they were "federal agents," their August 29, 2019, search at Naicom's Data Center was not a search without a warrant because the Defendants had previously suspended their initial search on August 27 at the Plaintiffs' request, which "triggered the need for the subsequent search." *Id.* at 30.  Thus, the search

"was not a second, warrantless search . . . but rather a valid continuation of the original search." *Id.* at 31.

### 1.    The Plaintiffs' Opposition

The Plaintiffs oppose the DISH/NagraStar Defendants' motion to dismiss by first insisting that they have validly stated a claim upon which relief can be granted because the "Fourth Amendment protects business[es] and corporations from unreasonable searches and seizures." *Pls.' Opp'n to DISH/NagraStar Defs.' Mot.* at 13 (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977)).

As to the Defendants' first argument, the "Plaintiffs submit that they are not implying a cause of action expanding *Bivens* to a claim that arises under a 'new context' or involve[es] a 'new category of defendants.'" *Id.* at 16.  They argue their "claim does not arise under a 'new context'" but instead "falls squarely under the provinces of *Bivens* and *Franks* where the Supreme Court clearly established that a violation of a person's Fourth Amendment rights by federal officers, acting under color of federal law gives rise to a federal cause of action for damages for unconstitutional conduct where the issuance of the search warrant was based on false statements to establish probable cause." *Id.* at 16-17.

Second, the Plaintiffs say that "[c]ontrary to [t]he DISH/NagraStar defendants' arguments Plaintiffs' right to sue federal officers and actors derives from the constitution itself." *Id.* at 20.  The Plaintiffs submit that "[a]s of today, Congress has not either legislated any law disproving [that] monetary damages [can] be awarded under *Bivens*, nor has divested the federal Courts of their federal-question adjudicatory authority to do so." *Id.* at 21.

Third, the Plaintiffs assert that "the Dish/NagraStar and FBI Special Agent[] defendants were operating exactly under the same investigatory legal mandate as in *Bivens*." *Id.* at 22. The Plaintiffs say that "[i]n the present case, as in *Bivens* . . . the FBI federal defendant agents and AUSA Cannon were seeking evidence for criminal prosecution for possible violations of United States conspiracy," copyright, and money laundering laws. *Id.* They argue that the federal defendants "unlawfully conspire[d] with the Dish/NagraStar defendants to make false allegations to the Magistrate Judge filing an affidavit containing false and perjured statements" which is "exactly what the Fourth Amendment, *Bivens*, and *Franks* prohibit." *Id.* at 22-23. Citing *Franks v. Delaware*, 438 U.S. 154, 164 (1978), and *Aponte Matos v. Toledo Dávila*, 135 F.3d 182, 187 (1st Cir. 1998), the Plaintiffs say that "the use of false statements to obtain a search warrant violates the Fourth Amendment warrant requirement." *Id.* at 25.

Next, the Plaintiffs say that their claims would not require significantly different proof because it "would not require discovery or an investigation into evidence before numerous decision makers" because "[t]he factual allegations and legal controversy which gave birth to this *Bivens* cause of action are all derived from the same source, the unlawful sworn declaration filed with the Court, and the two warrantless searches." *Id.* at 26. The Plaintiffs also assert that based on the documents already on the docket, in the absence of the alleged false statements, "the magistrate judge would never have issued the search warrant. *Id.*

Finally, the Plaintiffs argue that the DISH/NagraStar Defendants do not constitute a "new category" of defendant under *Bivens*. *Id.* They say that "[t]here is little question that a private actor that conspires with a Governmental official to violate the Constitution is subject to liability," *id.* at 28 (citing *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922 (1982); *Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)), and that the DISH/NagraStar Defendants "squarely meet all three [tests to be characterized as federal actors]; (1) Nexus Test; (2) the Symbiotic Relationship Test; and the (3) Public Function Test." *Id.* at 29-30.

The Plaintiffs submit that even if their "claims [are] viewed as an expansion of *Bivens* liability, their claims should stand because state law remedies do not provide adequate deterrence." *Id.* at 42. The Plaintiffs cite *Carlson v. Green*, 446 U.S. 14 (1980), for the proposition that "it was *Bivens* and not the Federal Tort Claims Act . . . [that] Congress had in mind [as the appropriate remedy] and [that Congress] did not intend to limit a *Bivens* Action to an FTCA." *Id.* at 43. The Plaintiffs say that the *Carlson* Court applied several factors—the deterrent effect of a *Bivens* versus FTCA suit, the availability of punitive damages and a jury trial under *Bivens*, and whether the state where the alleged misconduct took place permits a cause of action under state law. *Id.* at 43-44. Applying these factors, the Plaintiffs argue that "state tort law claims do not effectively address the conduct" and invocation of "a Federal Tort Claim Act instead" would be "futile" because "the Supreme Court of the United States had already ruled that the correct course of action is a *Bivens* Action[]." *Id.* at 45 (citing *Carlson*, 446 U.S. at 100). The Plaintiffs also say that the DISH/NagraStar

Defendants' argument that Rule 41(g) provides an adequate remedy is incorrect because money damages are not available under Rule 41(g). *Id.* at 46-47.

The Plaintiffs reject the DISH/NagraStar Defendants' argument that they did not properly plead a *Bivens* conspiracy claim. *Id.* at 47. The Plaintiffs say that there is ample evidence on the record that the Defendants "formed an agreement to deceive the federal magistrate" and that their "ultra vires motive in intruding into Naicom's Data Center and Offices was to appropriate themselves of Naicom's intellectual property" even though "[t]hey knew Plaintiffs were not engaged in tv piracy." *Id.* at 48.

Turning to the viability of each count, the Plaintiffs say that their allegations in Count One do state a claim on which relief can be granted because the evidence shows that the DISH/NagraStar Defendants were "performing the search to assist law enforcement efforts . . . to further their own ends, by using the FBI as an instrument to learn Naicom's methods of operation." *Id.* at 50. They also say that the record is clear "that any legitimate investigative purpose dissipated the moment they informed the FBI that Naicom was not using their equipment." *Id.* at 51.

Next, the Plaintiffs say that Count Two similarly states a valid claim because the DISH/NagraStar Defendants "knew they did not have a search warrant to enter Artist Designs & Management Corporation premises," were warned that it was a different business, and still entered the premises and executed a warrantless search and seizure. *Id.*

Finally, the Plaintiffs say that despite the Defendants' argument that they re-entered the Naicom Data Center on August 29, 2019, pursuant to the original warrant, Agent Pearson was aware that Naicom had all of its licensing contracts, which Mr. Quinones and Mr. Vega further confirmed during their FBI interview. *Id.* at 52. Thus, in support of Count Three, the Plaintiffs contend that the search warrant was fully executed and once executed the Defendants "did not have any authority . . . to re-enter Naicom's[] Data Center premises, unless they applied for a second warrant." *Id.* at 53.

## 2.    The DISH/NagraStar Defendants' Reply

In reply, the DISH/Nagra Star Defendants reiterate that the current action is significantly different than *Bivens* and that "[d]espite Plaintiffs' arguments to the contrary, functional equivalence is not the standard [for determining whether a case requires a *Bivens* expansion], as even 'significant parallels' are not enough to warrant a finding of no new context." *DISH/NagraStar Defs.' Reply* at 5 (quoting *Abbasi*, 137 S. Ct. at 1864). The Defendants further state that "[c]ourts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause'" and that, as a result, the Court should reject an "amendment-by-amendment ratification" approach to *Bivens*. *Id.* (first quoting *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019), then *De La Paz v. Coy*, 786 F.3d 367, 372 (5th Cir. 2015)).

Second the Defendants reassert that they are "private actors not covered by the scope of Plaintiffs' *Bivens* claims." *Id.* at 6. Defendants say that the Plaintiffs' reliance on *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 312 (D. Mass. 1999),

27

is misplaced because the case was decided before *Minneci* "which unequivocally rejected the identical argument to expand *Bivens* to non-governmental actors." *Id.* at 7. Quoting *Stoutt v. Banco Popular de Puerto Rico*, 320 F.3d 26, 33 (1st Cir. 2003), the Defendants say that "[t]he First Circuit has consistently interpreted the Supreme Court's holding in *Malesko* as 'limit[ing] *Bivens* actions by refusing to extend them to private entities acting under color of federal law.'" *Id.*

Third, the Defendants say that the Plaintiffs' reliance on *Carlson* does not negate that the FTCA is available to them as an alternative remedy because "the Supreme Court has [since] determined the availability of a remedy under the FTCA to be a significant factor militating against creating a *Bivens*-type remedy." *Id.* at 8 (citing *Abbasi*, 137 S. Ct. at 1863). Thus, "the mere fact that the FTCA might not provide Plaintiffs with all the relief they seek does not justify finding an expansion of *Bivens* warranted in this case, but rather counsels against it." *Id.* The Defendants further cite *Omran v. United States*, No. 1:14-CV-13881, 2016 WL 4158556, at *10-11 (D. Mass. June 22, 2016) for the proposition that "[a]lthough Rule 41(g) does not provide damages as a remedy, [a] remedial scheme need not provide [complete] relief to the plaintiff to qualify as a special factor." *Id.* at 9 (internal quotation marks omitted). The Defendants therefore contend that "the absence of money damages . . . does not negate [Rule 41(g)'s] status as an adequate, alternative remedy" to a *Bivens* claim. *Id.* In closing, the DISH/NagraStar Defendants reiterate that even if the Court finds it appropriate to expand *Bivens* here, all three counts should be dismissed for failure to state a claim. *Id.* at 9-10.

**B.      The Government Defendants' Motion to Dismiss**

Like the DISH/NagraStar Defendants, the Government Defendants apply the two-part *Bivens* expansion test and argue that the Plaintiffs have not stated a cognizable *Bivens* claim.  *Gov't Defs.' Mot.* at 7-9.  The Government Defendants put forth the same arguments as the DISH/NagraStar Defendants, and the Court does not separately reiterate them here.  *See id.* at 9-22.

In addition to arguing that *Bivens* is unavailable to the Plaintiffs, the Defendants further contend that even if the Court chooses to expand *Bivens*, AUSA Cannon is entitled to absolute immunity, or at the very least, qualified immunity.  *Id.* at 23.  As to absolute immunity, the Defendants argue that AUSA Cannon's actions, including evaluating evidence provided to him by the FBI and meeting with co-defendants for that purpose, were "part of his preparation to initiate the criminal process."  *Id.* at 26-27.  They argue that AUSA Cannon's "conduct . . . was functionally prosecutorial and associated with his role in the judicial phase of a criminal investigation; specifically, assisting in the preparation and filing of the warrant affidavit."  *Id.* at 29.  As to the warrant itself, the Defendants say that AUSA Cannon "did not swear to the facts of the search warrant in a way that made [him] more akin to a witness than a prosecutor in this function.  Rather, this legal review . . . is more akin to pre-trial evidence gathering intimately associated with the judicial process that is protected by absolute immunity."  *Id.* (alteration in *Gov't Defs.' Mot.*) (quoting *Haworth v. Walla Walla Cnty.*, No. 4:19-CV-5254-TOR, 2021 U.S. Dist. LEXIS 89172, at *33 (E.D. Wash. May 10, 2021)).

Even if AUSA Cannon is not entitled to absolute immunity, the Government
Defendants submit that he is, at minimum, entitled to qualified immunity. *Id.*
Applying the first prong of the qualified immunity test, the Defendants say that
"[r]eviewing an affidavit in support of a search warrant, notarizing the affidavit and
authorizing a police officer to present that application to a judge does not state a claim
under the Fourth Amendment." *Id.* at 31 (quoting *Lewis v. Hoppe*, No. 16-cv-378-pp,
2020 U.S. Dist. LEXIS 194100, at *11 (E.D. Wis. Oct. 20, 2020)). Additionally, the
Defendants note that the warrant application was approved by a magistrate judge,
suggesting that law enforcement acted in "objective good faith." *Id.* (quoting
*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). Finally, the Defendants
contend that it is "not unconstitutional for a federal prosecutor to fail to adequately
investigate prior to filing charges, and several courts have found prosecutors are
entitled to qualified immunity for such claims." *Id.* at 31-32. The Defendants
conclude by asserting that all claims against AUSA Cannon should be dismissed
because they represent "mere conjecture and bare speculation." *Id.* at 32 (quoting
*Noble v. Brady*, No. 1:19-cv-31, 2020 U.S. Dist. LEXIS 115521, at *16 (W.D. Pa. July
1, 2020)).

The Government Defendants go on to contend that the FBI defendants should
similarly be entitled to qualified immunity. However, even if they are not, "[t]he
allegations against [them] lack the requisite specificity." *Id.* at 33. In particular the
Defendants say that the Complaint "is deficient because it fails to specify each FBI
defendant's constitutional violation" and "[i]nstead, Plaintiffs allege a collective legal

wrong" without "plead[ing] that each defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 33. Additionally, they say that vicarious liability is inapplicable under *Bivens* so "government officials may not be held liable for unconstitutional conduct of their subordinates under a theory of respondeat superior. *Id.* at 33-34.

As to Count One, the Defendants argue that the FBI agents are entitled to qualified immunity because the agents acted pursuant to their "discretionary functions" in creating and submitting the warrant affidavit. *Id.* at 35. The Defendants submit that the Plaintiffs did not establish the three required *Franks* elements to prove reckless falsification of the warrant affidavit, as (1) "they do not state facts to support a finding of a falsehood in the affidavit," and instead "baldly and repeatedly state, without more, that the warrant contained 'false and perjured' statements," which the court need not accept; (2) the Plaintiffs did not establish or allege "that the supposed 'false' information invalidates the magistrate's finding of probable cause, and thus the legality of the search," *id.* at 36-37, and that absent this, the "magistrate's finding of probable cause is entitled to 'great deference.'" *Id.* at 37 (quoting *Moreta-Ramirez v. Lemert*, 233 F. Supp. 2d 286, 291 (D.P.R. 2002)). Lastly, the Complaint "is devoid of any facts suggesting when or how the federal defendants knew or should have known that the information provided by Plaintiffs' competitors was false or inaccurate, 'particularly where the information involved complex technology and was potentially subject to dispute.'" *Id.* at 38 (quoting *Xiaoxing Xi v. Haugen*, No. 17-2132, 2021 U.S. Dist. LEXIS 63863, at *26 (E.D. Pa. March 31, 2021)).

Regarding Count Two, the Government Defendants offer similar arguments to those made by the DISH/NagraStar Defendants and contend that the "Artist Designs [office] was *within* a space shared with Naicom." *Id.* at 38-39. Moreover, the Government Defendants say that "an owner or operator of a business has an expectation of privacy in commercial property that 'is different from, and indeed less than, a similar expectation in an individual's home.'" *Id.* at 40 (citing *Every v. Town of Littleton*, 380 F. Supp. 3d 173, 179 (D.N.H. 2019)).

Similarly, on Count Three the Government Defendants echo the DISH/NagraStar Defendants in arguing that they were entitled to search the Naicom Data Center on August 29, 2019, because the warrant had not yet expired and their return search was a reasonable continuation of the August 27 search in light of the fact that the agents agreed to pause the initial search upon Mr. Quinones' and Mr. Vega's request. *Id.* at 40-42.

### 1. The Plaintiffs' Opposition

The Plaintiffs repeat arguments made in opposition to the DISH/NagraStar Defendants' motion to dismiss. The Court does not repeat them here. *See Pls.' Opp'n to Gov't Defs.' Mot.* at 22-37.

As to immunity, the Plaintiffs submit that AUSA Cannon is not entitled to absolute immunity because he "participated in this case as an investigator" and "advis[ed] and coach[ed] [the FBI agents] on how to proceed in the investigation." *Id.* at 43. The Plaintiffs emphasize that "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the

other." *Id.* at 44 (emphasis omitted) (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)).

Second, the Plaintiffs argue that AUSA Cannon is similarly not entitled to qualified immunity and that the Government Defendants' framed their argument and cited cases without important context. *Id.* at 46. The Plaintiffs say that "what [they] are imputing to defendant AUSA Cannon is that after reviewing the information and analyzing the evidence collected from [the] . . . criminal investigation, he knew that he did not have probable cause to seek a search warrant, and still opted to conspire with the rest of the defendants." *Id.* That such behavior is unlawful, the Plaintiffs contend, is "clearly established for civil liability purposes" and "prohibited and punishable under criminal law." *Id.* at 46-47 & 47 n.4 (citing 18 U.S.C. §§ 2234-2236).

As to qualified immunity for the FBI agents and supervisors, the Plaintiffs argue that "[t]he allegations against the FBI defendants support the requisite specificity" based on details disclosed in the FBI search report that Agent Lange provided to Mr. Vega. *Id.* at 48. However, the Plaintiffs say that "[t]o be more specific, [they] will have to wait for discovery." *Id.* at 49.

Second, the Plaintiffs argue that "[p]ursuant to *Franks*, the affidavit and the warrant [are] void and the defendants executed an illegal search and seizure . . . and are liable pursuant to *Bivens*" because the "federal defendants knowingly, intentionally with reckless disregard for the truth included in the warrant affidavit" false and perjured statements and "that the affidavit's remaining content [when

excluding all perjured statements] was insufficient to establish probable cause." *Id.* at 56. The Plaintiffs thus assert that "the federal defendants do not enjoy qualified immunity" on Count One. *Id.* at 57.

Third, the Plaintiffs state that the Defendants' reliance on photographs of the ADM offices to argue that Suites 207 and 208 were shared spaces, is "totally false and [is] being used with the intent to deceive the Court." *Id.* at 57-58. They allege that the "federal defendants are hiding from the Court [] the fact that Artist Designs & Management Corporation . . . was established as an independent corporation" in June 2014, before Naicom's founding, and that the ADM corporation has an independent lease for Suite 207. *Id.* at 58.

Fourth, the Plaintiffs say that the Court must determine "whether probable cause dissipated" in analyzing whether the August 29 search was unconstitutional. *Id.* at 64. The Plaintiffs argue that after executing the first search the Government Defendants learned more about the Plaintiffs' licensing and distribution contracts, yet despite this knowledge of the Plaintiffs' legitimacy, AUSA Cannon ordered a second search be performed. *Id.* at 64-65. As a result, the "warrant expired once it was fully executed at Naicom's Offices and Data Center." *Id.* at 67.

### 2.    The Government Defendants' Reply

In reply, the Government Defendants say that "being afforded Fourth Amendment protections does not automatically entitle a plaintiff to redress under *Bivens*." *Id.* at 3. They say that "*Bivens* does not create any substantive rights" and the "[f]ederal courts lack the authority to engage in the distinctly legislative task of creating causes of action for damages to enforce federal positive law." *Id.* at 4 (first

quoting *Martinez v. United States*, No. 1:10-2156, 2012 U.S. Dist. LEXIS 129809, at
*19 (M.D. Pa. Aug. 7, 2012), then *Hernandez v. Mesa*, 104 S. Ct. 735, 752 (2020)
(Thomas, J., concurring)).

As to the strength of the caselaw cited by the Plaintiffs, the Government
Defendants say that the Plaintiffs do not adequately support their arguments, and
where they do, the cases are factually or legally distinguishable.  *Id.* at 8.  In support,
the Defendants include a table pointing out the discrepancies in, or inapposite nature
of, the Plaintiffs' citations.  *Id.* at 8-10.  The Defendants further say that the Plaintiffs'
reliance on *Carlson* is outdated because, post-*Abbasi*, courts have held that
"*Carlson*['s] holding concerning FTCA no longer has 'vitality' in light of [*Abbasi*]."  *Id.*
at 11 (quoting *Turkmen v. Ashcroft*, 02-cv-02307 (DLI) (SMG), 2021 U.S. Dist. LEXIS
171343, at *22 (E.D.N.Y. Sept. 9, 2021)).

As to immunity, the Defendants maintain that "[l]iability under . . . *Bivens*
requires personal involvement."  *Id.* at 13 (quoting *Boudette v. Buffington*, No. 20-
1329, 2021 U.S. App. LEXIS 24512, at *8 (10th Cir. Aug. 17, 2021)).  Thus, because
"AUSA Cannon did not participate in any of the challenged searches . . . 'even if those
warrant applications contained falsehoods, responsibility would lie with the affiants,'
which is not AUSA Cannon."  *Id.* at 13-14 (quoting *Boudette*, 2021 U.S. App. LEXIS
24512, at *8).  As to the FBI Defendants' qualified immunity, they say that the
"Plaintiffs [did] not deny that Artists Designs and Naicom shared office space" and
argue that Artist Designs' certificate of incorporation and lease contract were not
visible at the time of the search.  *Id.* at 14.

The Defendants also say that the "Plaintiffs' argument that probable cause 'dissipated' immediately after the first search [on August 27] upon examining the fruit of their seizure is unavailing." *Id.* at 15. They say that "[i]t is simply implausible for the Federal Defendants to have reviewed the electronic evidence seized from Plaintiffs within two days, especially when this evidence entailed matters of complex and evolving technology." *Id.* at 16. The Federal Defendants cite *Celestin v. City of New York*, 581 F. Supp. 2d 420, 432 (E.D.N.Y 2008) for the proposition that "once probable cause was established to obtain the search warrants in question, the officers were not required to look through the evidence seized to investigate the suspect's innocence." *Id.* Thus, "[i]f the FBI Defendants reasonably thought they had not concluded the search, the brief passage of time did not dissipate the continued existence of probable cause to search the premises." *Id.*

Finally, the Government Defendants say that they "acted within the scope of their employment" pursuant to the "Westfall Act," which "afford[s] absolute immunity from suit where they were acting within the scope of employment, but allow[s] the suit to proceed against the federal government." *Id.* at 16-17. In accordance with the Act, the Defendants attach a "Certification of Scope of Employment" signed by the United States Attorney for the District of Puerto Rico. *Id.*, Attach. 1, *Certification of Scope of Employment*, at 1.

### 3.   The Plaintiffs' Sur-Reply

In their sur-reply the Plaintiffs reiterate their arguments as to the applicability of the Fourth Amendment to businesses and maintain that federal question jurisdiction enables the Court to imply a cause of action in this case. *See*

*Pls.' Sur-Reply* at 2-8.  The Plaintiffs say that "a simple reading of [28 U.S.C. § 1331] clearly establishes that when a party has a cause of action arising under the constitution for the deprivation of constitutional rights, and the controversy involves the sum or value of $3,000, the aggrieved party can file a civil suit in federal Court for the resolution of the constitutional dispute." *Id.* at 8.  They argue that Congress "has not found the need to legislate any other law implementing monetary awards approved in *Bivens* since the reach of Section 1331 already affords compensatory or punitive damages." *Id.*

The Plaintiffs further argue that, contrary to the Defendants' assertion, their case law is "current, on point, and approved by multiple Federal Courts, even post *Abbasi*." *Id.* at 12.  They insist that "*Carlson* remains good and controlling law" because "if the [Supreme] Court intended to overrule *Carlson* . . . it would simply do so." *Id.* at 16 (quoting *Doe v. United States*, 381 F. Supp. 3d 573, 615 (M.D.N.C. 2019)).

As to the FTCA, the Plaintiffs contend that "[g]overnment employees sued in their individual capacities for acts committed within the scope of their official duties are not proper defendants to any claim brought under the FTCA" which "ends the matter." *Id.* at 19.

As to the Defendants' closing argument that they are protected by the Westfall Act, the Plaintiffs contend that "the Federal Defendants did not include this defense in their motion to dismiss, therefore, it is waived" and that even if they had, "[t]he Federal Defendants did not act within the scope of their employment." *Id.* at 27.

37

Because they did not act within the scope of employment, the Defendants "clearly do not qualify for . . . protection and this Court should reject the [Westfall] certification outright." *Id.* at 30.

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations

(which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   DISCUSSION

"In *Bivens*, the [United States Supreme] Court held that a Fourth Amendment violation by federal agents, acting under color of governmental authority, gave rise to a cause of action for money damages against those agents in their individual capacities." *González v. Vélez*, 864 F.3d 45, 52 (1st Cir. 2017) (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971)). The Supreme Court has implied a right of action against federal officials in three circumstances. The first was in *Bivens*, where the Supreme Court permitted a private right of action for a Fourth Amendment violation after law enforcement officers handcuffed a man in his own home in front of his family without a warrant. *González*, 864 F.3d at 52 (citing *Bivens*, 403 U.S. at 389). The second was in *Davis v. Passman*, 442 U.S. 228, 243-44 (1979), where a congressional staffer asserted Fifth Amendment violations due to sex discrimination against a member of Congress. The third was in *Carlson v. Green*, 446 U.S. 14 (1980), involving an Eighth Amendment claim against

39

federal corrections officers who failed to treat a prisoner's asthma while he was incarcerated.

### A.    Whether *Bivens* Should Be Expanded

The Supreme Court has "specified that when a *Bivens*-type claim is lodged, the appropriate analysis must begin by determining whether the plaintiff is seeking to extend the *Bivens* doctrine to a new context [beyond that of *Bivens*, *Davis*, or *Carlson*]," *González*, 864 F.3d at 52 (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017), or to a "new category of defendants." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). If a court determines the context is "new," the court must then "ask whether an alternative means of obtaining relief exists and, if so, whether 'special factors' counsel hesitation in extending the reach of the *Bivens* doctrine." *González*, 864 F.3d at 52-53 (quoting *Abbasi*, 137 S. Ct. at 1865). "While the boundaries of *Bivens*-type liability are hazy, the Supreme Court . . . [has] made plain its reluctance to extend the *Bivens* doctrine" beyond the settings identified in *Bivens*, *Davis*, and *Carlson*.[8] *Id.* at 52; *see*

---

[8]    In *Abbasi*, Justice Kennedy provided context for the evolution of *Bivens* claims. *See* 137 S. Ct. at 1855. He explained that in the mid-20th century, the Supreme Court followed an "*ancien regime*" whereby the Court "assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Id.* (first quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), then *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). As a result, the Supreme Court routinely "impl[ied] causes of action not explicit in the statutory text itself." *Id.* It was during this "*ancien regime*" that the Supreme Court decided *Bivens*, *Davis*, and *Carlson*. "[T]here was a possibility that 'the Court would keep expanding *Bivens* until it became the substantial equivalent of 42 U.S.C. § 1983,'" had the Court not "adopted a far more cautious course before finding implied causes of action." *Id.* (quoting Kent, *Are Damages Different?:* Bivens *and National Security*, 87 S. CAL. L. REV. 1123, 1139-40 (2014)). Justice Kennedy noted that "[g]iven the notable change in the Court's approach to recognizing implied causes of action, . . . the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity. This is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.' Indeed, the Court has refused to do so for the past 30 years." *Id.* at 1857 (quoting *Malesko*, 534 U.S. at 68). To

*also Abbasi*, 137 S. Ct. at 1848.  In fact, the Supreme Court has "gone so far as to observe that 'if the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that we would have reached the same result." *Hernandez*, 140 S. Ct. at 742-43 (alteration in *Hernandez*) (quoting *Abbasi* 137 S. Ct. at 1856).  The Supreme Court has also expressly stated that "for almost 40 years [it has] consistently rebuffed requests to add to the claims allowed under *Bivens*." *Id.* at 743.

### 1.  Whether the Case Involves a New Context or New Category of Defendants

The Court must first consider whether the Plaintiffs' claims are brought in a new context or against a new group of defendants.

### a.  New Context

Under the first prong of the *Bivens* extension analysis, "a context is considered new '[i]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court.'" *González*, 864 F.3d at 52 (alterations in *González*) (quoting *Abbasi*, 137 S. Ct. at 1859).  A "meaningful difference" may be "small, at least in practical terms," *Abbasi*, 137 S. Ct. at 1865, and may arise even when the claim at issue is "based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743.  The Supreme Court has explained:

---

the extent that the Plaintiffs argue that a *Bivens* remedy is inherent under this Court's federal question jurisdiction, *Pls.' Opp'n to DISH/NagraStar Defs.' Mot.* at 20-21, the Supreme Court rejected this proposition.  *See Hernandez*, 140 S. Ct. at 742 ("Justice Harlan's *Bivens* concurrence argued that this power is inherent in the grant of federal question jurisdiction . . . but our later cases have demanded a clearer manifestation of congressional intent").  Furthermore, in light of *Abbasi*, the Court is not generally permitted to infer a cause of action unless it presents circumstances that are the same as those in *Bivens*, *Davis*, or *Carlson*, as inferred causes of action are disfavored.

41

A case might differ in a meaningful way because of [1] the rank of the officers involved; [2] the constitutional right at issue; [3] the generality or specificity of the official action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5] the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or [7] the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1860.

In light of the Supreme "Court's expressed caution about extending the *Bivens* remedy . . . the new-context inquiry is easily satisfied." *Id.* at 1865. Generally, "[c]ourts considering whether to recognize an implied cause of action under *Bivens* in 'new context[s]' should proceed with caution because it is generally the role of Congress, not the courts, to provide for a damages remedy." *Hornof v. Waller*, No. 2:19-cv-00198-JDL, 2020 U.S. Dist. LEXIS 198578, at *54 (D. Me. Oct. 20, 2020) (alteration in *Hornof*) (citing *Abbasi*, 137 S. Ct. at 1857 ("[T]he Court has urged 'caution' before 'extending *Bivens* remedies into any new context'" (quoting *Malesko*, 534 U.S. at 74))); *see also Drewniak v. U.S. Customs & Border Prot.*, No. 20-cv-852-LM, 2021 U.S. Dist. LEXIS 67937, at *12 (D.N.H. Apr. 8, 2021) ("Indeed, *Abbasi* expressed what one Court of Appeals deemed 'open hostility' to recognizing additional Bivens actions" (quoting *Tun-Cos v. Perrotte*, 922 F.3d 514, 521 (4th Cir. 2019))).

### i.   Analysis

The Court must first consider whether Plaintiffs' Fourth Amendment claims present a "new context" under Supreme Court precedent.[9]  *Bivens* itself is the most

---

[9]     The Court simultaneously addresses both sets of Defendants' arguments as to whether this case would require extending *Bivens*.

analogous of the three seminal *Bivens* cases, as it involved a Fourth Amendment claim against federal agents. *See González*, 864 F.3d at 52 (citing *Bivens*, 403 U.S. at 389). In *Bivens*, the plaintiff alleged that Federal Bureau of Narcotics agents "entered his apartment and arrested him for alleged narcotics violations." *Bivens*, 403 U.S. at 389. During the arrest, officers handcuffed the plaintiff in front of his wife and children and threatened to arrest the entire family. *Id.* After thoroughly searching the plaintiff's apartment the federal agents took the plaintiff to the federal courthouse "where he was interrogated, booked, and subjected to a visual strip search." *Id.* In his complaint the plaintiff "asserted that the arrest and search were effected without a warrant, . . . that unreasonable force was employed in making the arrest," that agents did not have probable cause, and that the agents' unlawful conduct caused him "great humiliation, embarrassment, and mental suffering." *Id.* With reference to the circumstances presented in *Bivens*, the Court must determine whether the factual circumstances of this case are the same or present a "new context." The Court concludes that the Plaintiffs' claims arise in a new context.

To begin, the fact that the Plaintiffs' claims arise under the Fourth Amendment, like the suit in *Bivens*, does not preclude a "new context" finding. "Courts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Cantú v. Moody*, 933 F.3d 414, 422-23 (5th Cir. 2019) ("No one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth Amendment's Due Process Clause is

fair game in a *Bivens* action"); *Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019) ("[T]reating all search-and-seizure cases the same would contradict the Supreme Court's direction that a context can be new even if it involves the same constitutional right as an existing case" (citing *Abbasi*, 137 S. Ct. at 1859)); *see also Abbasi*, 137 S. Ct. at 1859 ("Even though the right and the mechanism of injury were the same in [*Malesko*] as they were in *Carlson*, the Court held that the contexts were different"); *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021) (noting that, unlike Bivens, "this case . . . involves searches and a seizure conducted *with* a warrant" (emphasis original)).

The Court finds particularly instructive the Fourth Circuit case, *Annappareddy v. Pascale*,[10] which involved highly analogous circumstances. In that

---

[10]    The Plaintiffs instead ask the Court to follow *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) and *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). The Plaintiffs say that *Jacobs* stands for the proposition that "a plaintiff's 'garden-variety *Bivens* claims' against individual law enforcement officials for excessive force, false arrest, malicious prosecution, fabrication of evidence, and civil conspiracy were viable post-*Abbasi*." *Pls.' Opp'n to Gov't Defs.' Mot.* at 32. As the *Jacobs* Court rightly notes, the Supreme Court confirmed in *Abbasi* that *Bivens* is still good law, *see Abbasi*, 137 S. Ct. at 1857 ("The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere"), but "caution[ed] against expanding its outer reaches." *See Jacobs*, 915 F.3d at 1037. As the Sixth Circuit stated, *Abbasi* "clarifies the analytical framework for how courts must approach asserted *Bivens* claims" but in no-way renders pre-*Abbasi* cases null. *Id.*

       To the extent that the Plaintiffs rely on *Jacobs* purely because it concluded that "excessive force, false arrest, malicious prosecution, fabrication and evidence claims" are viable post *Abbasi*, this broad characterization is not sufficient to withstand a motion to dismiss because "[c]ourts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Cantú*, 933 F.3d at 422-23.

       To the extent that the Plaintiffs rely on *Jacobs* as an analogous case because the Sixth Circuit concluded the plaintiff's claims were "run-of-the-mill challenges to 'standard law enforcement operations,'" the facts in *Jacobs* are distinguishable and much more akin to those in *Bivens*. *Jacobs* involved a warrantless search of Jacobs' home after agents believed that a fugitive was hiding there. *Jacobs*, 915 F.3d at 1033-34. There was no warrant in *Jacobs* nor any alleged falsification of an affidavit to support probable cause for a warrant; instead, Jacobs claimed that officers planted a gun at the scene "in an attempt to bolster their claim that he pulled a gun on them before the shooting." *Id.* at 1042; *see Greenlaw v. Klimek*, No. 4:20-CV-311-SDJ, 2021 U.S. Dist. LEXIS 245789, at *16 (E.D.

case the Maryland Medicaid Fraud Control Unit (MFCU) investigated a pharmacy's billing practices for Medicaid fraud. 996 F.3d at 127. After being cleared of all charges, the owner of the pharmacy brought a *Bivens* action. In his complaint, the owner alleged that an MFCU investigator, who was working with one of the plaintiff's employees, encouraged the employee to fabricate evidence and "passed . . . false information to prosecutors 'as if it were accurate and reliable.'" *Id.* The plaintiff also alleged that investigators with the United States Department of Health and Human Services rigged findings, ignored potentially exculpatory information, and then "used this falsified analysis as evidence to obtain [] a search warrant." *Id.* Among his accusations, the plaintiff claimed that the FBI had "actual knowledge" of the "fabrications and falsehoods" and "acted at least recklessly in making them" and "without this flawed evidence . . . the [a]ffidavit would not have established probable cause, and the magistrate judge would not have issued the warrants." *Id.*

The *Annappareddy* Court ultimately concluded that the case presented a "new context" because the "alleged misdeeds" were different than those in *Bivens*, the search involved a warrant, proving the case would impose on the executive branch in a way that *Bivens* did not, and the case involved the search of a corporate entity rather than of an individual. *Id.* at 135-137. Given the Fourth Circuit's sound

---

Tex. Dec. 27, 2021) (distinguishing *Jacobs* on its facts from a case involving misstatements and omissions in a warrant affidavit).

Finally, the Plaintiffs rely on § 1983 case law to support their arguments. While the Supreme Court has characterized *Bivens* as the "federal analog" to § 1983 claims, it has also described *Bivens* claims as "more limited." *Hernandez*, 140 S. Ct. at 747; *see also Abbasi*, 137 S. Ct. at 1855 (implying that *Bivens* is narrower than § 1983 because had the Supreme Court continued on the same path as *Bivens*, *Davis*, and *Carlson*, *Bivens* would have continued to expand to become "the substantial equivalent of 42 U.S.C. § 1983").

reasoning and the similarities between *Annappareddy* and this case, that Court comes to a similar conclusion here.

First, the Court notes, and finds meaningfully different, the Defendants' actions in this case compared to those in *Bivens*. In *Bivens* the defendants handcuffed the plaintiff in front of his family, threatened to arrest his family, and booked and strip-searched the plaintiff. The Defendants in this case did not do anything akin to this conduct. Based on the Amended Supplemental Complaint, the DISH/NagraStar Defendants conducted a preliminary investigation and alerted the FBI that Naicom may be pirating copyrighted materials. Then, all the Defendants met regularly regarding the investigation and allegedly conspired to falsify a search warrant and affidavit, after which the FBI Defendants and DISH/NagraStar Defendants executed the search warrant and questioned Mr. Quinones and Mr. Vega.

Notably, the law enforcement actions in this case and those in *Bivens* occurred at different points in the life of a criminal case. In *Bivens* the plaintiff was immediately arrested for his alleged criminal conduct; in this case, the Defendants were seeking a search warrant in the hopes of uncovering illegal conduct that would give probable cause for an eventual arrest. As noted by the Eight Circuit, these types of "information-gathering and case-building activit[ies] are a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Farah*, 926 F.3d at 496, 499 (concluding that a complaint accusing the police of "exaggerating and inventing facts in reports, hiding evidence that would have exonerated [defendants], and pressuring and manipulating the alleged victims into

lying" presented materially different circumstances from those in *Bivens*); *see also Annappareddy*, 996 F.3d at 136 ("[T]he Court in *Bivens* never contemplated the kind of extensive data gathering, analysis, examination, and coordination at issue in this case" (quotation marks and citations omitted)); *Greenlaw v. Klimek*, No. 4:20-CV-311-SDJ, 2021 U.S. Dist. LEXIS 245789, at *13 (E.D. Tex. Dec. 27, 2021) (concluding that "a case about investigators and a prosecutor who allegedly falsified evidence in connection with a lengthy criminal investigation to facilitate a notorious investor's short and distort scheme" involved materially different conduct than that in *Bivens*).

A particularly important point of factual distinction between this case and *Bivens* is the warrant. Although both *Bivens* and this case involve Fourth Amendment claims, *Bivens* centered on an unreasonable search and seizure *without* a warrant; in this case, the Plaintiffs do not dispute that the Defendants *had* a warrant. Instead, the Plaintiffs argue that the Defendants did not have probable cause to obtain the warrant, alleging that the "warrant application contained deliberately and/or reckless false and perjured statements, . . . which misled the Magistrate Judge to believe probable cause existed." *Suppl. Am. Compl.* ¶ 7.

The issuance of a warrant makes this case meaningfully different from *Bivens* because "the Fourth Amendment sharply distinguishes between with-warrant and warrantless searches, treating the introduction of a warrant as a signal moment in the proceedings." *Annappareddy*, 966 F3d at 135-36; *see also Greenlaw,* 2021 U.S. Dist. LEXIS 245789, at *14. In particular, the Supreme Court has explained:

> Because a search warrant provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper

> searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime, we have expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.

*United States v. Leon*, 468 U.S. 897, 913-14 (1984) (internal quotation marks and citations omitted)).  Given the Supreme Court's differentiation between searches with and without warrants and the development of the "good faith" exception for searches *with* warrants, *see id.*, the Court concludes that a search with a warrant—regardless of whether it was properly acquired with probable cause—is meaningfully different from the warrantless search in *Bivens*.

The Court agrees with the Defendants that the warrant at issue here ran against Naicom, the corporation, and not against Mr. Quinones and Mr. Vega as individuals, which further differentiates this case from *Bivens*.  As the Fourth Circuit has noted, "[t]here appear to be no cases—in the Supreme Court or any other court—approving a *Bivens* claim for acts taken against a corporate entity" and this Court has found none.  *Annappareddy*, 996 F.3d at 136-37 ("[W]e find it significant that the search warrants in this case ran against the corporate entity of Pharmacare, and not the plaintiff himself"); *see also Life Savers Concepts Ass'n v. Wynar*, 387 F. Supp. 3d 989, 998-99 (N.D. Cal. 2019) ("Thus, because *Bivens*, *Davis*, and *Carlson* do not involve a corporate entity seeking to assert a *Bivens* action on behalf of employees, the instant case presents a new *Bivens* context").

The Plaintiffs argue that they are entitled to a *Bivens* remedy because businesses are protected by the Fourth Amendment.  In particular they cite *G.M.*

*Leasing Corporation v. United States*, 429 U.S. 338, 353 (1977), for the proposition that "[t]he Supreme Court's precedents leave no doubt that proprietors of commercial premises, including corporations, also have the right to conduct their business free from unreasonable official privacy intrusion." *Pls.' Opp'n to Gov't Defs.' Mot.* at 23. Although the Plaintiffs are correct that the Supreme Court has held that businesses are entitled to Fourth Amendment protections, this broad proposition does not save them from the conclusion that a Fourth Amendment case involving a business is meaningfully different than *Bivens*. The Court agrees with the Government Defendants that "being afforded Fourth Amendment protections does not automatically entitle a plaintiff to redress under *Bivens*," *Gov't Defs.' Reply* at 3, because "[n]ot all constitutional claims are cognizable in a *Bivens* action." *Drewniak*, 2021 U.S. Dist. LEXIS 67937, at *10. If falling under the umbrella of Fourth Amendment protections was all that was needed to seek redress under *Bivens*, the Supreme Court would not have instructed courts to analyze whether a *Bivens* action presents a new context or is brought against new defendants.

In *Farah v. Weyker*, the Eighth Circuit found relevant how directly the defendant's actions caused the alleged harm. The *Farah* Court noted that *Bivens* involved "humiliation, embarrassment, and mental suffering," which could all be directly attributed to the defendants' conduct. 926 F.3d at 499. In contrast, the *Farah* Court found that allegations of exaggeration and inventing facts in reports and hiding evidence did not reflect direct harm, rather harm through "intervening steps involv[ing] decisions by independent legal actors" including the prosecutors who

brought charges, the grand jury that voted to indict, and the magistrate who approved the defendants' continued detention. *Id.*; *see also Xiaoxing Xi v. Haugen*, No. 17-2132, 2021 U.S. Dist. LEXIS 63863, at *48-49 (E.D. Pa. Mar. 31, 2021) (concluding that the alleged harm was caused through intervening steps in an "indirect mechanism of injury" where the plaintiff claimed that the defendant recklessly disregarded evidence of his innocence, made false statements and representations in reports, affidavits, and communications with prosecutors, and used false testimony to get an indictment).

The Court finds this argument persuasive under the circumstances of this case and concludes that the alleged harm occurred after a series of intervening decisions. The DISH/NagraStar Defendants brought the Plaintiffs' potentially illegal activity to the attention of the FBI, but the search only took place after (1) the FBI agents evaluated the claims and decided to pursue the case; (2) AUSA Cannon evaluated the FBI evidence to determine that there was probable cause to seek a search warrant; and (3) the Magistrate Judge made an independent finding that there was probable cause to grant the Defendants a search warrant. The alleged harm caused by the DISH/NagraStar Defendants would not have occurred without the intervening acts of the FBI, the prosecutor, and the Magistrate Judge; the alleged harm caused by the FBI Defendants would not have occurred but for the intervening acts of the prosecutor and the Magistrate Judge; and the alleged harm caused by the prosecutor would not have occurred except for the Magistrate Judge's determination of probable cause, and the FBI's subsequent execution of the warrant. As in *Farah* and *Xiaoxing*

*Xi*, unlike the conduct of the *Bivens* defendants who handcuffed, humiliated, and strip searched the plaintiff, here, the connection between the Defendants' actions and the alleged harm is attenuated.

In addition to different circumstances, this case requires different proof than what was required in *Bivens*. There, the plaintiff had to prove a physical invasion and search without probable cause; here, the Plaintiffs must prove that the Defendants made "intentional or reckless misstatements or omissions [that] implicate the very truthfulness, not just the sufficiency, of a warrant application." *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005); *see also Ahmed v. Weyker*, 984 F.3d 564, 569 (8th Cir. 2020) (comparing doctrinal differences between false arrest and warrant falsification cases). Resolving this issue requires application of *Franks v. Delaware*, 348 U.S. 154 (1978), to determine whether the affidavit submitted by the Defendants contained a falsehood, whether eliminating the falsehood would negate probable cause, and whether the falsehood was included in the affidavit purposefully, deliberately or with reckless disregard for the truth. *Jordan v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019); *see also Burke*, 405 U.S. at 82 ("[T]he *Franks* standard for suppression of evidence informs the scope of qualified immunity in [] civil damages suit[s] against officers who allegedly procure a warrant based on an untruthful application").

The Plaintiffs say that proving their claim "would not require discovery or an investigation into evidence before numerous decision-makers" and that documents already on the Court's docket show that the Magistrate Judge did not have probable

cause. *Pls.' Opp'n to DISH/NagraStar Defs.' Mot.* at 26. The Court disagrees. Because the *Franks* analysis probes not only the sufficiency of the affidavit, but its truthfulness, to prove their claim the Plaintiffs would have to delve into the subjective beliefs of the officers at the time of the warrant and determine what the officers knew, at what points in time they knew certain information, and what information was shared between the DISH/NagraStar Defendants and the Government Defendants. This, in turn, would require the Plaintiffs to engage in the "type of fact-checking and conscious-probing, . . . which can, as the Supreme Court has warned, impose 'substantial costs.'" *Annappareddy*, 996 F.3d at 136 (quoting *Ahmed*, 984 F.3d at 570); *see also Ahmed*, 984 F.3d at 568 ("Lying and manipulation, however bad they might be, are simply not the same as the physical invasions that were at the heart of *Bivens*").

In sum, the Court finds that there are ample differences that render this case a "new context" dissimilar from *Bivens, Davis*, or *Carlson*: (1) the case involves investigatory actions in a nascent criminal case rather than the arrest of a suspect; (2) the Defendants were conducting a search with a warrant rather than a warrantless search; (3) the search was of business premises rather than a home; and (4) the Plaintiffs do not ground their claims in a physical intrusion but rather allege the falsification of a warrant affidavit, subjecting their claims to the *Franks* standard. Even if the "new context" were a closer call, the Court would nonetheless reach the same conclusion given the Supreme Court's explicit hesitancy to expand *Bivens* to new contexts and the low threshold for what qualifies as a "new context."

### b.    New Category of Defendants

A second way that *Bivens* can be extended is if the claims are brought against a category of defendant different from those in *Bivens*, *Davis*, or *Carlson*.  *Hernandez*, 140 S. Ct. at 743.  However, a defendant does not need to prove that a case presents both a new context and is brought against a new category of defendants.  In this particular case, the DISH/NagraStar Defendants argue that the Court should dismiss the claims against them because private investigators are "new categories of defendants."  *DISH/NagraStar Defs.' Mot.* at 14-18.  To resolve this issue the Court must determine whether the DISH/NagraStar Defendants were private parties "acting under the color of federal law," or fully private parties whose inclusion in a *Bivens* lawsuit would expand liability to a new category of defendants.

To begin, the Court notes the disagreement among the district courts in this circuit on whether the First Circuit flatly prohibits *Bivens* claims against private parties, regardless of whether they were acting under color of federal law, or whether a court must look to the individual conduct and circumstances in the case, applying a similar framework as to § 1983 claims.  *Compare Marinkovic v. Osborne*, No. 19-cv-209-JL, 2019 U.S. Dist. LEXIS 99364, at *5 (D.N.H. Apr. 19, 2019) ("Liability under *Bivens*, however, cannot attach to private actors"), *with Rios v. United States*, No. 14-40171-IT, 2016 U.S. Dist. LEXIS 40262, at *21-22 (D. Mass. Feb. 26. 2016) ("When determining whether a party is a 'federal actor' under Bivens, courts rely on tests analogous to those employed in Section 1983 actions"); *see also Chin v. Bowen*, 833 F.2d 21, 24 (2d Cir. 1987) ("Courts of Appeals have held that section 1983 concepts of

state action apply in determining whether action was taken 'under color of federal law' for *Bivens* purposes").

This confusion originates in a footnote in *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927(1st Cir. 1974) which states that "there is no cause of action against private parties acting under color of federal law or custom." *Id.* at 932 n.8. The defendant in that case was a National Bank. Later, in *Stoutt v. Banco Popular De Puerto Rico*, 320 F.3d 26 (1st Cir. 2003), the First Circuit stated that "[t]he Supreme Court has already limited *Bivens* actions by refusing to extend them to private entities acting under color of federal law." *Id.* at 33 (citing *Malesko*, 534 U.S. 61). At the same time, the First Circuit has not definitively ruled whether a private entity can, under certain circumstances, act "under color of federal law." Consequently, one district court questioned the binding effect of the First Circuit's statement in *Fletcher*. *See Sarro v. Cornell Corr., Inc.*, 248 F. Supp. 2d 52, 58 (D.R.I. 2003) (stating that reliance on the *Fletcher* footnote is "misplaced" because *"Fletcher* did not involve a *Bivens* claim" and that the First Circuit had previously implied, in *Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447 (1st Cir. 1983), "that a private party acting under color of federal law may be liable under *Bivens*").

Were the Court to apply the more flexible § 1983 "color of law" tests, it would have to consider (1) the state compulsion test; (2) the nexus/joint action test; and (3) the public function test. *Klunder v. Brown Univ.*, 778 F.3d 24, 30-31 (1st Cir. 2015). Under the state compulsion test, "a private party is fairly characterized as a state actor when the state has exercised coercive power or has provided such significant

54

encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State." *Id.* at 30 (quoting *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (alteration in *Estades-Negroni*) (internal quotation marks omitted)).   Second, under the nexus/joint action test, a private party is a state actor "where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'" *Id.* at 31 (quoting *Estades-Negroni*, 412 F.3d at 5 (alterations in *Estades-Negroni*) (quoting *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999))).   Finally, a private party is a state actor under the "public function" test "if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.'" *Id.* (quoting *Estades-Negroni*, 412 F.3d at 5 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

Applying the § 1983 tests here—accepting as true the Plaintiffs' allegations that the DISH/NagraStar Defendants conspired with the Government Defendants, met with FBI agents throughout the investigation, accompanied the FBI to execute the search warrant, searched Naicom without FBI supervision, and questioned Mr. Quinones and Mr. Pimentel alongside the FBI agents—the Plaintiffs have properly stated a claim that the DISH/NagraStar Defendants may have been acting under the color of federal law.   The facts as alleged suggest that the DISH/NagraStar Defendants were acting as federal agents would by insinuating themselves into every

aspect of the investigation. *See Second Am. Compl.* ¶ 98 (describing the DISH/NagraStar Defendants as "expert workers" for the FBI). While it is possible that their substantial involvement was due to the technical nature of the investigation subject matter, that is a factual issue requiring additional discovery.

However, this conclusion does not save the Plaintiffs' *Bivens* claim against the DISH/NagraStar Defendants. The law does not require that the case present *both* a new context and a new category of defendants for the Court to dismiss this *Bivens* action. That this case presents a new context is, by itself, enough to preclude Plaintiffs' *Bivens* action from proceeding against the DISH/NagraStar Defendants, even if Plaintiffs have properly stated a claim that they were acting under the color of federal law.

Separately, applying "new defendants" caselaw, the Plaintiffs cannot maintain a *Bivens* action against AUSA Cannon, as it is well established that prosecutors are "new defendants" that would expand *Bivens*. *See Hornof*, 2020 U.S. Dist. LEXIS 198578, at *56 ("Three [of the defendants] are prosecutors, who have never been recognized by the Supreme Court as proper defendants under *Bivens*"); *see also Greenlaw*, 2021 U.S. Dist. LEXIS 245789, at *14 ("Defendant Bunch is a prosecutor, not an on-the-scene, investigative officer. His role as a federal officer—which includes reviewing evidence, deciding whether to seek a search warrant, and pursuing criminal charges—meaningfully differs from the narcotics agents in *Bivens*"); *Martin v. Gray*, No. 20-CV-741-JPS, 2021 U.S. Dist. LEXIS 162381, at *12 (E.D. Wis. Aug. 27, 2021) ("The addition of prosecutors would likely expand *Bivens* to a new set of

defendants—one historically afforded great discretion" (citing *Wayte v. United States*, 470 U.S. 598, 607-08 (1985) ("[T]he decision to prosecute is particularly ill-suited to judicial review"))). The *Bivens* action against AUSA Cannon is therefore improper as he is both a "new defendant" and the action arises in a "new context."

### 2.    Special Factors Counseling Against Extension of a *Bivens* Remedy

Because this case presents a "new context," the Court must next consider whether there are special factors counseling hesitation against extending *Bivens*. The Supreme Court has yet to define "special factors counselling hesitation"[11] before expanding *Bivens* liability but has described it as something that "causes a court to pause before acting without express congressional authorization." *Abbasi*, 137 S. Ct. at 1857-58. Under this second step, courts must consider "separation-of-powers principles" and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id* at 1858*; see also Drewniak*, 2021 U.S. Dist. LEXIS 67937, at *15 ("[C]ourts have found 'military concerns, separation of powers, the comprehensiveness of available statutory schemes, national security concerns, and foreign policy considerations' to be special factors counseling hesitation" (quoting

---

[11]    "Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require." *Drewniak*, 2021 U.S. Dist. LEXIS 67937, at *15 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 573 (2d Cir. 2009) (*en banc*)).  "A factor counsels hesitation 'whenever thoughtful discretion would pause even to consider it.'"  *Id.* (quoting *Arar*, 585 F.3d at 573); *see also Abbasi*, 137 S. Ct. at 1858 ("[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III").

*Alvarez v. U.S. Immigr. & Customs Enforcement*, 818 F.3d 1194, 1206 (11th Cir. 2016))).

Courts should also consider whether there are alternative remedies available to the plaintiff. *Abbasi*, 137 S. Ct. at 1858, 1862-63. "For if Congress has created 'any alternative, existing process for protecting the [injured party's] interest' that itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Id.* (alterations in *Abbasi*). (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). However, courts are not required to find both "special factors counseling hesitation" *and* an alternative remedy. *Carlson*, 446 U.S. at 18 (explaining that a private right of action may be defeated when defendants show either special factors or an alternative remedy). The Second and Fifth Circuits have described the threshold for "factors counseling hesitation" as "remarkably low." *Hernandez v. Mesa*, 885 F.3d 811, 823 (5th Cir. 2018) (citing *De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc))).

### a.    Separation of Powers Concerns

The Court is reluctant to extend *Bivens* in this factual context in part due to separation of powers concerns. As noted above, "recognizing an implied cause of action here would pose a . . . risk of intruding on the executive branch's investigatory and prosecutorial functions." *Greenlaw*, 2021 U.S. Dist. LEXIS 245789, at *14. The type of "fact-checking and conscience-probing," *Annappareddy*, 996 F.3d at 136, that this case would require, were it to proceed, would require the judicial branch to "prob[e] executive charging decisions and peek[] behind the curtain" of investigatory

and prosecutorial decision-making. *Farah*, 926 F.3d at 499. As the Supreme Court has recognized, probing the "subjective good faith of government officials" comes with "substantial costs" as it could "distract[] . . . officials from their governmental duties, inhibit[] . . . discretionary action, and deter[] . . . people from public service." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *see also Annappareddy*, 996 F.3d at 136 (citing *Ahmed*, 984 F.3d at 569 (quoting *Harlow*, 457 U.S. at 816)); *Drewniak*, 2021 U.S. Dist. LEXIS 67937, at *28-29 ("'*Bivens* liability could deter agents from vigorous enforcement' of their duties" (quoting *De La Paz*, 786 F.3d at 379)).

As to AUSA Cannon specifically, the Court notes that "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). Because United States Attorneys are "designated by statute as the President's delegates to help him discharge his constitutional responsibilit[ies]," they have a great deal of "latitude." *Id.* (citing U.S. Const., art. II, § 3; 28 U.S.C. §§ 516, 547). As such, courts are "properly hesitant" to examine prosecutorial decisions, *id.* at 465 (quoting *Wayte*, 470 U.S. at 608), because of the "relative competence of prosecutors" and a desire "not to unnecessarily impair the performance of a core executive constitutional function," delay prosecutions or "undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* (quoting *Wayte*, 470 U.S. at 607). Because "a *Bivens* action is not 'a proper vehicle for altering an entity's policy'" or questioning the "formulation and implementation of a general policy," *Abbasi*, 137 S. Ct. at 1860, it would be

inappropriate for the Court to interfere with the investigatory decisions and policies of the United States Attorney's Office.

To the extent that the Plaintiffs cite *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018) to reason that separation of powers concerns are not present in this case, *see Pls.' Opp'n to Gov't Defs.' Mot.* at 29, 32, *Lanuza* is factually distinguishable. The plaintiff in *Lanuza* had been prosecuted, pleaded guilty, and was sentenced prior to initiating his *Bivens* action. *See id.* at 1022-23. Because Lanuza had already been prosecuted, the court reasoned that "[his] civil suit against Love will likely involve no more investigative intrusion than the criminal prosecution initiated against Love by the United States itself." *Id.* at 1030. Indeed, the Ninth Circuit determined that the *Bivens* action would "involve [undisputed] facts the government itself made publicly available" and would "not require unnecessary inquiry . . . into government deliberations or policy making." *Id.* at 1029.

Here, in contrast, the Plaintiffs have not been prosecuted and allowing Plaintiffs' *Bivens* action to proceed would require the judicial branch to inquire into the intentions, decisions, and policies of the executive branch in its investigative and prosecutorial decisions. *See Greenlaw*, 2021 U.S. Dist. LEXIS 245789, at *21-22 (distinguishing *Lanuza* on similar grounds); *see also Drewniak*, 2021 U.S. Dist. LEXIS 67937, at *30 (concluding that a *Bivens* action against Customs and Border Patrol agents would result in "unwarranted judicial intrusion into an area in which the Judiciary lacks comparative constitutional authority and competence").

Allowing Plaintiffs' *Bivens* claims to proceed would also intrude on the legislative branch, as the Judiciary is not well-positioned to resolve whether the Plaintiffs are entitled to the remedy they seek. Instead, Congress is in the best position to "consider and weigh the costs and benefits of allowing a damages action to proceed" and what is in the public's best interest. *Hernandez*, 140 S. Ct. at 743; *see also Byrd v. Lamb*, 990 F.3d 879, 881 (5th Cir. 2021). Congress has long been aware of the Supreme Court's *Bivens* precedent and could have enacted legislation making *Bivens* actions fully analogous with § 1983 claims. It has not done so. In the absence of congressional action and in light of the Supreme Court's stated hesitancy to extend *Bivens* to new contexts, allowing the Plaintiffs' *Bivens* action to proceed would be a foray into territory reserved for the legislative branch.

### b.    Alternative Remedial Scheme

The Court next considers whether there is an alternative remedial scheme available to the Plaintiffs. *See González,* 864 F.3d at 53 ("The existence of such alternative processes is a special factor that counsels convincingly against applying the holding in *Davis* to federal employees generally").

### i.    The Federal Tort Claims Act (FTCA)

Both the DISH/NagraStar Defendants and the Government Defendants point to the Federal Tort Claims Act (FTCA) as an alternative remedial scheme that precludes the Plaintiffs' *Bivens* remedy. *See DISH/Nagra Star Defs.' Mot.* at 21; *Gov't Defs.' Mot.* at 17-18. A plaintiff "may seek recovery directly from the United States under the FTCA," *Hernandez*, 140 S. Ct. at 748, which provides "the exclusive remedy

for most claims against Government employees arising out of their official conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010).

As a threshold matter, the Court must determine whether the Plaintiffs could theoretically recover under the FTCA.  "Under the FTCA, the United States waives its sovereign immunity for 'injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"  *Nogueras Cartagena v. United States*, 172 F. Supp. 2d 296, 309 (D.P.R. 2001) (quoting 28 U.S.C. § 1346(b)).  Section 2680(h) of the FCTA exempts certain intentional torts from the sovereign immunity waiver but expressly allows claims for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" that originate from "acts or omissions of investigative or law enforcement officers of the United States Government."  *Id.* at 311; 28 U.S.C. § 2680(h).

Courts have expressly held that fraudulent warrant applications and fraudulent affidavits in support of a warrant fall within the scope of the "abuse of process" claims permitted against investigative or law enforcement officers under the FTCA.  *See Hornof*, 2020 U.S. Dist. LEXIS 198578, at *39-40.  "Under the FTCA, [courts] look to [the] 'law of the place' where the alleged wrongful actions occurred," in this case Puerto Rico.  *Rucci v. United States INS*, 405 F.3d 45, 49 (1st Cir. 2005).  "Under Puerto Rico law, 'the two basic elements of abuse of process are a bad motive,

and the use of a legal process for an improper, collateral objective," *id.* at 49 (quoting *Microsoft Corp. v. Computer Warehouse*, 83 F. Supp. 2d 256, 261 (D.P.R. 2000)), which includes "challenges to the legal action's procedural components." *Id.*   Thus, the Plaintiffs could bring their claims under the FTCA, although not against all the Defendants.   Prosecutors are not "investigative or law enforcement officers" meaning the Plaintiffs cannot bring an FTCA action against AUSA Cannon but could bring one against the FBI Defendants.  *See Hornof*, 2020 U.S. Dist. LEXIS 198578, at *40 (citing *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014)).

Having determined that the Plaintiffs could recover under the FTCA, at least from the FBI Defendants, the Court must now turn to the heart of the parties' dispute, which is whether FTCA provides a suitable alternative remedial scheme.

The Plaintiffs argue that the Supreme Court foreclosed the FTCA as a suitable alternative to *Bivens* in *Carlson v. Green*.  In *Carlson*, the Supreme Court held that the FTCA was not a "substitute" for recovery under *Bivens*.  445 U.S. at 18.  The Court reasoned that the petitioners had not pointed to anything in the FTCA "or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations." *Id.*  The FTCA, the Court said, "was enacted long before *Bivens* was decided, [and] when Congress amended FTCA in 1974 . . . the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.* at 19-20.

Forty years later in *Hernandez v. Mesa*, faced with another *Bivens* suit, the Supreme Court looked to several federal statutes for alternative relief, including the FTCA, reasoning that the "pattern of congressional action . . . gives [the Court] further reason to hesitate about extending *Bivens*." 140 S. Ct. at 749. The Court explained that traditionally, "civil litigation addressed abusive conduct by federal officers . . . by subjecting them to liability for common-law torts." *Id.* at 748. The Court went on to say that after it decided *Westfall v. Erwin*, 484 U.S. 292 (1988), "Congress passed the so-called Westfall Act, formally the Federal Employees Liability Reform and Tort Compensation Act of 1988 . . . [which] makes the . . . FTCA 'the exclusive remedy for most claims against Government employees arising out of their official conduct.'" *Id.* (quoting *Hui v. Castaneda*, 559 U.S. 799, 806 (2010)). In a footnote, the Court explained that "[t]he Act also permits claims 'brought for a violation of the Constitution.' By enacting this provision, Congress made clear that it was not attempting to abrogate *Bivens*, but the provision certainly does not suggest . . . that Congress intended for a robust enforcement of *Bivens* remedies. . . . Instead, the provision simply left *Bivens* where it found it. It is not a license to create a new *Bivens* remedy in a context we have never before addressed." *Id.* at 748 n.9 (internal quotation and citation omitted) (citing *Malesko*, 534 U.S. at 68).

Since *Hernandez* and *Abbasi*, there has been confusion among the courts as to whether the FTCA is an alternative remedy foreclosing a *Bivens* action and the extent to which *Abbasi* and *Hernandez* impact the Supreme Court's holding in *Carlson*. *Compare Boule v. Egbert*, 998 F.3d 370, 392 (9th Cir. 2021) ("[T]he exclusiveness of

the FTCA remedy was not extended to constitutional torts such as Fourth Amendment . . . claims"); *Helvig v. United States*, No. CV 18-7939 PSG (JCx), 2019 U.S. Dist. LEXIS 228444, at *19 (C.D. Cal. Oct. 1, 2019) (stating that "the Westfall Act 'has an explicit exception for *Bivens* claims, allowing them to proceed against individuals,' suggesting Congress did not intend to foreclose a *Bivens* remedy" (quoting *Rodriguez v. Swartz*, 899 F.3d 719, 740 (9th Cir. 2018))), *with Turkmen v. Ashcroft*, No. 02-cv-02307 (DLI) (SMG), 2021 U.S. Dist. LEXIS 171343, at *21-22 (E.D.N.Y. Sept. 9, 2021) ("In *Ziglar*, the Supreme Court made it clear that the legal landscape has changed since *Carlson*. . . . In determining that the FTCA is an available alternative remedy to preclude a *Bivens* remedy, the magistrate judge properly compared *Carlson* and *Ziglar* and found that 'Ziglar takes a far broader view of' alternative remedies that preclude a *Bivens* remedy").

The First Circuit has not taken a position on this issue, but the Court need not resolve this dispute here.  In *Carlson* the Court stated that an implied right of action could be defeated in two situations: (1) when defendants present "special factors counselling hesitation;" or (2) when the Plaintiffs have an alternative remedy available.  446 U.S. at 18-19.  In *Carlson*, the Supreme Court found neither special factors nor an alternative remedy and thus allowed plaintiffs' *Bivens* action to proceed.  Regardless of the applicability of the FTCA, here, the Court found significant separation of powers concerns and concluded that the judiciary is not in the best position to imply a cause of action.  In other words, unlike *Carlson*, there are special factors counseling hesitation here.  These special factors are, themselves,

sufficient to deny Plaintiffs' *Bivens* action.  *See Hernandez*, 140 S. Ct. at 750 n.12 ("[W]e explained that existence of alternative remedies was merely a further reason not to create *Bivens* liability"); *Greenlaw*, 2021 U.S. Dist. LEXIS 245789, at *18 ("the FTCA's statutory scheme is only one of several factors giving this Court pause, and its absence would not lead to a contrary result").  Moreover, the bar for what "counsels hesitation" against expanding *Bivens* is so low that the simple fact that the FTCA is a potential alternative is sufficient to give this Court pause.  *See Oliva v. Nivar*, 973 F.3d 438, 443-444 (5th Cir. 2020) ("'[T]he existence of a statutory scheme for torts committed by federal officers' weighs against inferring a new cause of action" (quoting *Cantú*, 933 F.3d at 423)).

To the extent that the FTCA is available to them, Plaintiffs say that the FTCA is not an appropriate alternative to *Bivens* because they cannot get punitive damages and the FTCA does not permit jury trials.  *See Pls.' Opp'n to DISH/NagraStar Defs.' Mot.* at 43-44.  As to the unavailability of punitive damages, the Supreme Court and First Circuit have dispensed with that argument.  In *González v. Vélez*, the First Circuit rejected the plaintiff's argument that Title VII and the Civil Services Reform Act (CSRA) did not provide an "equally effective remediation" to *Bivens* because punitive damages were unavailable.  864 F.3d at 54.  Citing *Bush v. Lucas*, 462 U.S. 367, 372 (1983), in which the Supreme Court denied a *Bivens* claim even though the alternative remedial scheme, the CSRA, did not include a punitive damages remedy, the First Circuit concluded that "[t]he fact that other or different relief might be available" did not justify creating "new causes of action on an ad hoc basis [that]

would create a patchwork" of remedies, which Congress had been attempting to avoid. *Id.* at 54-55.

Applying this reasoning, the absence of punitive damages under the FTCA is not a proper basis to expand *Bivens* and imply a cause of action under the factual circumstances of this case. Given congressional efforts to craft a tort remedy against government officials through the FTCA, the judiciary is ill "suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed" in a new context that departs from the circumstances in *Bivens*. *Abbasi*, 137 S. Ct. at 1857-58. In *Farah v. Weyker*, the Eighth Circuit stated that "the [Supreme] Court has . . . made clear that even remedies that provide *no* compensation for victims and little deterrence for violators, such as injunctions and writs of habeas corpus, trigger the general rule that 'when alternative methods of relief are available, a *Bivens* remedy usually is not.'" 926 F.3d at 502 (emphasis in original) (quoting *Abbasi*, 137 S. Ct. at 1863); *see also Malesko*, 534 U.S. at 74 (holding that injunctive relief and grievances filed through the Bureau of Prisons' Administrative Remedy Program are adequate alternative remedies).

Similarly, that the FTCA does not offer sufficient deterrence or allow for a jury trial does not justify allowing Plaintiffs' *Bivens* action to proceed. The wide array of alternative remedies endorsed by the Supreme Court in cases denying a *Bivens* action similarly suggests that an adequate alternative remedy need not provide the plaintiff a jury trial. *See Ramirez v. Tatum*, No. 17 Civ. 7801 (LGS), 2019 U.S. Dist. LEXIS 88027, at *5-6 (S.D.N.Y. May 24, 2019) ("Plaintiff's argument that the FTCA is an

insufficient alternative remedy, because it disallows jury trials, is invalid.  As the Supreme Court has explained, sufficient alternative remedies come in many forms other than jury trials, including habeas corpus petitions, a civil service regulatory complaint process, an injunction or 'some other form of equitable relief'" (quoting *Abbasi*, 137 S. Ct. at 1858, 1865)); *see also Minneci v. Pollard*, 565 U.S. 118, 129 (2012) ("We note, as Pollard points out, that state tort law may sometimes prove less generous than would a *Bivens* action, say, by capping damages. . . . But we cannot find in this fact sufficient basis to determine state law inadequate.  State-law remedies and a potential *Bivens* remedy need not be perfectly congruent").

### ii.    Rule 41(g)

The DISH/NagraStar and Government Defendants further argue that Rule 41(g) of the Federal Rules of Criminal Procedure provides an alternative remedy for the Plaintiffs that precludes their *Bivens* action.  *See DISH/NagraStar Def.'s Mot.* at 22; *Gov't Defs.' Mot.* at 20.  Rule 41(g) states in relevant part:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  The motion must be filed in the district where the property was seized.  The court must receive evidence on any factual issue necessary to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

FED. R. CRIM. P. 41(g).  District courts in this Circuit have previously held that Rule 41(g) recovery can preclude a *Bivens* action.  *See Omran v. United States*, No. 14-13881-LTS, 2016 U.S. Dist. LEXIS 190990, at *28 (D. Mass. June 1, 2016).

The Plaintiffs say that this remedy is not a suitable alternative to *Bivens* because it is an equitable remedy and monetary damages are unavailable.  Although

Rule 41(g) does not provide damages as a remedy, "[a] remedial statute need not provide full relief to the plaintiff to qualify as a 'special factor.'" *Id.* (quoting *Leyland v. Edwards*, 797 F. Supp. 2d 7, 10 (D.D.C. 2011)) (holding that a *Bivens* claim brought by a plaintiff alleging that a search warrant was issued on fabricated statements and that a search exceeded the scope of the issued warrant was "barred due to Rule 41(g) providing an adequate, comprehensive procedural and remedial scheme"); *see also De La Paz*, 786 F.3d at 377 (declining to accept the argument that the Immigration and Nationality Act, which does not provide a damages remedy, was not an alternative remedy to *Bivens* because "[t]he absence of monetary damages in the alternative remedial scheme is not ipso facto a basis for a *Bivens* claim"); *Wilson v. Libby*, 535 F.3d 697, 705-06 (D.C. Cir. 2008) ("[T]he availability of *Bivens* remedies does not turn on the completeness of the available statutory relief"). As the Fifth Circuit has stated, the proposition that an alternative remedy to *Bivens* must provide the "exact equivalent" relief is a "misreading of the case law." *De La Paz*, 786 F.3d at 377 (citing *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability")).

The Court therefore concludes that Rule 41(g) is an alternative remedy available to the Plaintiffs and serves as an additional factor counseling hesitation in expanding *Bivens*.

### iii.     31 U.S.C. § 3724

Finally, the Government Defendants argue that the Plaintiffs have an alternative remedy under 31 U.S.C. § 3724.  This statute provides, in relevant part that:

> The Attorney General may settle, for not more than $50,000 in any one case, a claim for personal injury, death, or damage to, or loss of, privately owned property, caused by an investigative or law enforcement officer as defined in section 2680(h) of title 28 who is employed by the Department of Justice acting within the scope of employment that may not be settled under [the FTCA].

31 U.S.C. § 3724.  The Plaintiffs argue that § 3724 is not a suitable alternative because their suit is not one "involv[ing] a claim for personal injury, death, or damage to, or loss of, privately owned property."  *Pls.' Opp'n to Gov't Defs.' Mot.* at 35.  The Court agrees that the Plaintiffs do not allege property loss or damage or any type of personal injury.  Even so, the inapplicability of this statute does not change the Court's analysis that Rule 41(g) and the FTCA are alternative remedial schemes available to the Plaintiffs or its conclusion that it would be improper to expand *Bivens* in this case.

### 3.     Conclusion

The Court concludes that the Plaintiffs' *Bivens* action may not proceed against any of the Defendants.  The Plaintiffs' case presents the Court with a new context that raises concerns about the separation of powers.  Cognizant of the Supreme Court's repeated warnings that expanding *Bivens* is disfavored, and in light of the

alternative remedies available to the Plaintiffs, the Court concludes that Plaintiffs' claims should be dismissed.[12]

## VI.    CONCLUSION

The GRANTS the Defendants' motions to dismiss (ECF Nos. 176, 183) and DISMISSES without prejudice Plaintiffs' Supplemental Amended Complaint (ECF No. 202)

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of March, 2022

---

[12]    Given the Court's conclusion that Plaintiffs' *Bivens* action may not proceed, the Court does not reach the merits of the parties' other arguments, including whether the Government Defendants are entitled to absolute or qualified immunity and whether the Plaintiffs have failed to state a claim on which relief can be granted.